CONTINENTAL BANKERS LIFE INSURANCE COMPANY OF the SOUTH, Petitioner,

v.

The BANK OF ALAMO, Respondent.

Supreme Court of Tennessee.

March 12, 1979.

T. J. Emison, Jr., Emison & Emison, P. C., Alamo, for respondent.

## OPINION

FONES, Justice.

This is a suit to recover $50,000 deposited in the Bank of Alamo by Peoples Protective Life Insurance Company (PPLI), represented by a certificate of deposit (CD) dated May 5, 1974, due in thirty days. Bank refused payment and defended the suit on the theory that the deposit was first made in November 1973 as "security" for a $100,000 loan to Peoples Protective Corporation (PPC), the parent corporation of the depositor, or in the alternative, that the parent's domination of the subsidiary allowed bank to invoke the "instrumentality" rule to disregard the corporate entities and gave rise to the right to set off the $50,000 CD against the loan balance due from the parent.

The trial court and the Court of Appeals held that the two corporations should be treated as one; the trial court apparently held that the bank had a security interest in the CD and also was entitled to set off the funds deposited against the loan balance, alleged to be $75,000. The Court of Appeals affirmed, without discussion of a security interest, and remanded the case to the trial court for an accounting by bank to determine the amount to be credited to the loan, realized and to be realized, from certain security that was given to the bank by the parent subsequent to default.

Billy Jack Goodrich and Curtis Mansfield represented both corporations in the original transaction with the Bank of Alamo in November 1973. Goodrich was general counsel and a director of both corporations and Mansfield was vice president and treasurer of both corporations. Robert W. Conley, executive vice president of the Bank of Alamo, made the loan in November 1973 and extended it in May 1974. On or about April 19, 1974, Joe Jack Merryman purchased all of the stock of the life insurance company from PPC; the sale was consummated May 1, 1974, and the name of the corporation was changed to Continental

William Rice, Jr., Rice & Rice, Jackson, for petitioner.

Bankers Life Insurance Company of the South, hereinafter referred to as plaintiff.

## I.

In the summer of 1973, Goodrich sought a loan from the Bank of Alamo on behalf of PPC and was advised by Conley that the bank was in the middle of its heavy lending period to its farming clientele and was not interested in any other loans. In early November 1973, Goodrich called Conley again and the bank agreed to make the loan. There is no dispute that the loan was to be $100,000 and that $50,000 was to be deposited with the bank, represented by a CD, and that the due date of both the loan and the deposit would be six months.

The transaction was closed on November 5, 1973. Goodrich and Mansfield came to the bank and delivered to Conley the following documents: (1) a resolution of the executive and finance committees of PPC authorizing Mansfield to act for that corporation in obtaining a $100,000 loan from the Bank of Alamo, certified by Jerrell H. Parchman, secretary of PPC; (2) an unsecured promissory note dated November 1973, signed by Mansfield as vice president and treasurer of PPC in the principal sum of $100,000, bearing interest at the rate of 9½ per annum and due in 180 days; and (3) a PPLI check dated 2 November 1973, in the sum of $50,000 payable to the Bank of Alamo, signed by Charles Dawson and countersigned by Mansfield.

Conley delivered to Goodrich and Mansfield the following documents: (1) a Bank of Alamo check in the sum of $100,000 payable to PPC and (2) a CD of the Bank of Alamo, # 3080 dated November 5, 1973, with this recitation on its face:

"Peoples Protective Life Insurance Company has deposited in this bank exactly $50,000 dollars payable to themselves in current funds on the return of this certificate properly endorsed 6 months after date with interest at the rate of 5½ per cent per annum for the time specified only."

s/ Patricia Nolen
Authorized Signature

It is undisputed that the five documents described above are the only writings involved in the November transaction. The note has no language reciting that any security, pledge or collateral was given. The CD was facially unencumbered and, as stated, it was delivered to Goodrich and Mansfield.

May 5, 1974, was the due date of the note and the CD. Neither the trial court nor the Court of Appeals gave any consideration to the facts surrounding the extension of the loan and the reissuance of the CD in May 1974.

Goodrich called Conley about May 10, or May 11, and asked for a thirty-day extension of the loan, which was refused. Goodrich then proposed that PPC pay $25,000 plus the six months accumulated interest, plus interest in advance at the rate of 10%, for a thirty day extension on the $75,000 balance. Conley accepted that proposal. PPC's check was mailed to the bank.

At the time that Conley and Goodrich discussed and agreed upon the thirty-day extension, PPC had sold all of the stock of PPLI to Merryman and members of his immediate family, and Goodrich was neither an officer nor a director of PPLI. The agreement for the sale of the stock was made on or about April 19, 1974, and the sale was consummated on or before the first day of May 1974.

On May 8, 1974 PPLI delivered the November CD to the collections department of the First National Bank of Jackson, Tennessee with the request that it be sent to the Bank of Alamo for collection. The record is not explicit as to the date the certificate was received at the Bank of Alamo, but it is certain that it was received subsequent to consummation of the Conley-Goodrich agreement to extend the due date of the balance of the loan to PPC. Upon receipt of the CD, Conley attempted to contact Goodrich but was unable to do so prior to departing to attend a bankers' convention. He instructed Mac Goode, assistant vice president of the Bank of Alamo, to contact Goodrich and remind him of the

November agreement, that, in Conley's words, the CD would "stay there as long as the loan was there."

Goode's version of his conversation with Goodrich on Monday, May 13, 1974, was as follows: On direct examination he testified that he called Goodrich, reminded him of the November agreement that the "note would be paid in full before we released the funds"; that Goodrich acknowledge that was the agreement but said "he wanted to check" and would call back; that Goodrich called back the same morning and said "go ahead and renew the CD"; that Goode then issued the new CD backdated to May 5, due June 5, 1974, to coincide with the due date of the loan.

On cross examination Goode admitted that someone else from "the life insurance company" called him that morning and discussed the interest rate with him. He would not admit that the caller told him the life insurance company had been sold, but acknowledged receiving a letter from J. Michael Houser, vice president of PPLI, dated May 13, confirming the redeposit of $50,000 for a period of thirty days from May 5, 1974, at five percent interest, and informing Goode that the life insurance company was under new ownership and management.

Goodrich's version of the call from Goode was as follows: Conley had asked Goode to call and inform him that the owners of PPLI wanted to cash the CD and, "Could I help them keep the deposit"; that he explained to Goode that he was no longer connected with the life insurance company since it had been sold, but he would do what he could; that he called Houser, told him the substance of Goode's call and asked him if he would "see what he could do about keeping the CD at the Bank of Alamo." It is undisputed that after these conversations on May 13, Goode having possession of the $50,000 CD due on May 5, 1974, had a new $50,000 CD issued, payable to Peoples Protective Life Insurance Company, due June 5, 1974, with interest at five percent, and directed the issuance of a check to Peoples Protective Life Insurance Company in the

sum of $1,375.00 in payment of the interest from November 5, 1973, to May 5, 1974. The check and the CD were mailed to the bank ·in Jackson for delivery to Peoples Protective Life Insurance Company. The check was dated May 16, 1974, and was received by the Jackson bank on May 17, 1974. The letter from Houser to Goode advising that the insurance company was under new ownership and management was dated May 13, 1974, and Goode admitted that he would have received it in one or two days, mailed from Jackson.

PPC did not pay the note and on June 11, 1974, the bank was given, as security for the unpaid balance, notes and trust deeds, in a face amount that cannot be determined from the record, but was referred to several times as totalling $71,000. The bank took the position that the facts about the collateral given on June 11, and how much money had been realized thereon, were immaterial to the issues, and the trial court agreed. The Court of Appeals remanded for an accounting.

On or about June 14, plaintiff made formal demand upon the bank for payment of the May CD, which was refused.

## II.

Bank's answer asserts that Goodrich and Mansfield promised Conley that the $50,000 would be left with the bank "as security for the loan." Under cross examination at the trial on September 8, 1975, Conley testified as follows:

Q. Did Mr. Goodrich tell you—or Mr. Mansfield tell you that you would have a security interest of any kind in the certificate—represented by the money represented by the certificate of deposit in this case or was secured interest or collateral ever mentioned in connection with the loan.

A. Security interest was not mentioned.

Q. Was collateral ever mentioned?

A. I'm sure not.

When asked about a security interest at another stage of his testimony he said the

**630**

only security interest was set off. The trial court expressly found that the certificate of deposit represented "additional security for the loan," and the decree adjudged that bank was entitled to "possession" of the certificate of deposit. The Court of Appeals opinion did not expressly address the issue of a security interest in the CD.

The writing that constitutes the basis for petitioner's demand for payment is a certificate of deposit. It is an instrument subject to the commercial paper statute. *See Old Southern Life Ins. Co. v. Bank of North Carolina*, 244 S.E.2d 264 (N.C.App. 1978). T.C.A. § 47–3–104 provides the requirements of a negotiable instrument:

(1) Any writing to be a negotiable instrument within this chapter must

(a) be signed by the maker or drawer; and

(b) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this chapter; and

(c) be payable on demand or at a definite time; and

(d) be payable to order or to bearer.

(2) A writing which complied with the requirements of this section is

. . . . .

(c) a 'certificate of deposit' if it is an acknowledgment by a bank of receipt of money with an engagement to repay it.

The writing in controversy here meets all of the above criteria for negotiability except (1)(d), "be payable to order or to bearer"; the CD reads, "Payable to." Under pre-UCC law there was some authority that a CD in this form was negotiable. *See generally* 5B Michie's Banks and Banking §§ 313–328 (1973). Though the comments to T.C.A. § 47–3–104(1)(d) authorize court-imposed substitutes for the symbols of negotiability, it was the intent of the drafters that "in doubtful cases the decision should be against negotiability." Comment 5, T.C.A. § 47–3–104; *see* White & Summers,

Uniform Commercial Code 464–65 (1972). Nevertheless, though the instrument is non-negotiable, it still falls within the scope of the commercial paper chapter of Title 47. T.C.A. § 47–3–805 provides, "This chapter applies to any instrument whose terms do not preclude transfer and which is otherwise negotiable within this chapter but which is not payable to order or to bearer, except that there can be no holder in due course of such an instrument." *Accord, First Nat. Bank in Grand Prairie v. Lone Star Life Ins. Co.*, 17 UCC Rep. 835, 524 S.W.2d 525 (Tex.Civ.App.1975), *cert. denied*, 529 S.W.2d 67 (1975).

It is consistent with the commercial paper statute and with the parol evidence rule that a prior or collateral oral agreement which varies or contradicts the express terms of an instrument is inadmissible in evidence. *See Gibson Co. v. Fourth & First Nat. Bank*, 20 Tenn.App. 168, 177, 96 S.W.2d 184, 189 (1936); 17A C.J.S. *Contracts* § 323 (1963). *Cf. Lazarov v. Klyce*, 195 Tenn. 27, 255 S.W.2d 11 (1953). By its express terms, the CD provides for the payment of the amount on deposit plus interest upon maturity and demand by the holder of the instrument. The CD does not contain any restrictions on its face or provide that it is subject to a separate agreement. An oral agreement that money on deposit was to exist as a security interest certainly is inconsistent with the provisions of a negotiable instrument. In fact, Conley acknowledged that, to retain a security interest, the customary practice was for the bank to take possession of the CD or make a notation on a savings sheet. Of course, the proper method of perfecting would be to take the CD as a pledge by possession. T.C.A. § 47–9–304. The commercial paper chapter provides that an instrument "*may* be varied by a separate *written* agreement," (emphasis added) but consistent with the policy of promoting certainty in commercial transactions, it otherwise follows the provisions of the parol evidence rule. T.C.A. § 47–3–119. Moreover, there has been no showing of fraud, duress or mutual mistake which would suspend the operation of the rule. Thus the assertion that it was the "under-

standing" of the bank that the CD was security for PPC's loan is incompetent for it contradicts the express terms of the CD.

We find it pertinent to note that neither the Chancellor nor the intermediate court found that an oral agreement ever existed. Rather, the Chancellor characterized the "gist" of the action:

"The Defendant, Bank of Alamo, contends that all such transactions were tied together, *with the assumption clear that it was the intention* that the certificate of deposit was to be additional security for the loan and that this certificate of deposit should be applied to the balance of the loan made by the Bank of Alamo. (Emphasis added.)

■ It is our conclusion that there was no material evidence to support a finding that the CD represented "additional security for the loan", and that as a matter of law the bank had no security interest in the certificate of deposit.

### III.

■ This brings us to the principal defense to the action on the certificate of deposit, the right to set off the insurance company's $50,000 against the unpaid balance of the loan to its parent corporation, PPC. It is the general rule that to invoke the remedy of set off the debts must be due between the same parties, and in recognition of that principle, the bank predicates its right of set off upon its claim that the two corporate entities should be disregarded and treated as one, and both courts below have sustained that contention.

■ The general rule is that corporate entities will be recognized as separate and distinct from their stockholders and that to disregard the corporate entities requires, in the case of parent and subsidiary, more than a showing that they have similar corporate names and locations and the exercise of dominion through common officers and directors. *See* 18 Am.Jur.2d *Corporations* § 17 at 564–65 (1965). The case law covers a broad spectrum of disagreement as to the additional elements of proof required to disregard corporate entities.

The trial court and the Court of Appeals relied upon *Neese v. Fireman's Fund Ins. Co.*, 53 Tenn.App. 710, 386 S.W.2d 918 (1964). In that case, the Court of Appeals found that Scott N. Brown, the majority stockholder of two corporate entities, operated the corporations as a single entity, including commingling their funds to such an extent that the bank accounts amounted to a single treasury. The suit was brought by Neese, trustee in bankruptcy of First Trust Company, to recover upon a real estate agent's and salesman's bond that covered losses occasioned by failure of Real Estate Management, Inc. to remit rents collected for the account of its principals. The trustee sought to recover rents collected and allegedly not remitted by Real Estate Management, Inc. to its affiliated corporate entity, First Trust Company. The Court of Appeals opinion cites a number of cases wherein corporate entities have been disregarded, in a variety of situations, but applied the identity theory, which was appropriate under the facts of that case.

The Court of Appeals, in the case at bar, interpreted a quote in the *Neese* opinion as establishing the principles for determining the application of the instrumentality theory. We do not agree that the *Neese* court intended the quote from 1 Fletcher Cyc. Corp. § 43 (perm. ed. 1963) to define the elements of proof required to invoke the instrumentality rule in Tennessee.

The Tennessee cases involving efforts to disregard corporate entities and hold one corporation liable for the debts of another, often referred to as "piercing the corporate veil", provide no significant analogy to the instant case. In the considerable body of American case law, all of the numerous theories, such as alter ego, instrumentality, identity, agency and estoppel, have been articulated in widely varying language, and each theory has been criticized by one or more authoritative sources.

Our research has led us to the same conclusion as that expressed by the author of the annotation in 38 A.L.R.3d 1102 § 2 at 1110 (1971):

"There have been a number of formulations of rules of parental liability, varying from the short[1] to the long[2], but unfortunately the concept is still as enshrouded in the 'mists of metaphor'[3] as it was in 1926 when Judge Cardoza made that observation."

We are persuaded that the rule as formulated in *Lowendahl v. Baltimore & O. R. Co.*, 247 App.Div. 144, 287 N.Y.S. 62 (1936), aff'd 272 N.Y. 360, 6 N.E.2d 56, *rehearing denied*, 273 N.Y. 584, 7 N.E.2d 704 (1937), expresses the elements of proof required in a plurality of jurisdictions and is consistent with the expressions and results reached in most of the Tennessee cases. *See, e. g., Fisser v. International Bank*, 282 F.2d 231 (2d Cir. 1960); *Majestic Co. v. Orpheum Circuit, Inc.*, 21 F.2d 720 (8th Cir. 1927); *Brown v. Margrande Compania Naviera S. A.*, 281 F.Supp. 1004 (E.D.Va.1968); *National Bond Finance Co. v. General Motors Corp.*, 238 F.Supp. 248 (W.D.Mo.1964), aff'd, 341 F.2d 1022 (8th Cir. 1965).

 Paraphrased from *Lowendahl*, application of the instrumentality rule requires proof of the following three elements:

(1) The parent corporation, at the time of the transaction complained of, exercises complete dominion over its subsidiary, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the corporate entity, as to that transaction, had no separate mind, will or existence of its own.
(2) Such control must have been used to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights.
(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Tennessee Consol. Coal Co. v. Home Ice & Coal Co.*, 25 Tenn.App. 316, 156 S.W.2d 454 (1941) involved a question of priority between Roberts and the successor corporation to Independent Life Insurance Company in a general creditors proceeding. Independent came into possession of real estate and personal property upon a loan default and found it expedient to protect those assets by organizing and controlling the Home Ice and Coal Company. That corporation later became insolvent, and its assets were administered in Davidson County Chancery Court. In the trial court, the claim of the parent corporation, Independent, was subordinated to the claims of all creditors, including Roberts, on the grounds that Home Ice and Coal Company was a mere "agency or instrumentality" of Independent. Independent accepted that result as to all creditors except Roberts, maintaining on appeal that Roberts was not misled, deceived or defrauded because he was president of Independent when it organized and dominated the operation of Home Ice and Coal Company. The Court of Appeals affirmed Roberts' priority citing strong equitable considerations: that the money advanced by Roberts, personally, was used for operating expenses by the subsidiary and directly benefitted the parent as the proof showed that it had already received $13,000 out of the subsidiary's properties, which were worth only $3,000 or $4,000 when the corporation was organized. The Court of Appeals held that:

"By the ordinary rules of principal and agent, the Independent as principal is liable to Roberts for the acts of its agent within the scope of the agent's authority. It is not denied that the sums he advanced and the loan procured on the

---

1. "In order to hold one corporation liable for the debts of another it must appear that they are the business conduits or the alter ego of one another." *Smith v. Henry Knight and Son, Inc.*, 211 Ky. 111, 277 S.W. 290 (1925).

2. *Lowendahl v. Baltimore & O. R. Co.*, cited and referred to *infra*.

3. "The whole problem of the relation between parent and subsidiary corporations is one that is still enveloped in the mists of metaphor. Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it." *Berkey v. Third Ave. Ry. Co.*, 244 N.Y. 84, 155 N.E. 58 (1926), *rehearing denied*, 244 N.Y. 602, 155 N.E. 914 (1927).

pledge of his stock were received by the agent and used in the operation of the business, and thus went directly for the benefit of the Independent. The business was really the Independent's business, and the money advanced by Roberts for operating expenses of the business should be treated as advancements to the Independent." 25 Tenn.App. at 322, 156 S.W.2d at 458.

However, that Court also stated the following principle, apparently in reference to the application of the instrumentality rule:

"It is not necessary for one to show that he has been misled, deceived or actually defrauded, to enable him to invoke this rule. It is enough that the parent corporation's domination of the subsidiary was so complete as to make them practically indistinguishable or to make the subsidiary a mere tool, agency or instrumentality of the parent; and that he will suffer loss unless the parent be held." 25 Tenn.App. at 321, 156 S.W.2d at 458.

That statement was unnecessary to sustain the result in favor of Roberts.

In a factual situation involving priority among creditors, the courts are inclined to require less dominion of corporation operations and little equity; where, as here, the transaction attacked involves a direct contractual relationship, the proof required is more stringent. We agree with the result reached in *Home Ice & Coal Co.* but do not agree that the instrumentality rule was appropriately used or stated therein.

### IV.

Applying the three elements of the instrumentality rule to the facts in this case, we conclude, as a matter of law, that the bank has failed to make out a case that justifies disregard of the corporate entities of the life insurance company and its former parent corporation, to whom the loan was made.

Parenthetically, it is worthy of note that almost without exception, the relevant cases involve efforts to reach the assets of the parent corporation for the debts of the

subsidiary; whereas here, it is the subsidiary that proved to be financially stable, and the parent unstable. *See* Annot., 38 A.L. R.3d, *supra*. It is worthy of note, because this record shows that the bank did not give a "thought" to requiring from the parent any of the usual types of collateral, or requesting a security interest in the CD.

Conley gave the following testimony at the trial on September 8, 1975:

Q. Mr. Connelly [sic], do you think that Mr. Goodrich and Mr. Mansfield acted in bad faith in making representation to you in connection with this loan?

A. No, sir.

Q. Do you think that Mr. Goodrich or Mr. Mansfield made any misrepresentations to you or attempted to defraud the Bank of Alamo in connection with this loan?

A. With the making of this—

Q. Any false representations or—

A. (Interposing) In the making of this loan?

Q. Yes, sir. Or attempted to defraud the bank?

A. No, sir.

The trial court found that neither Goodrich nor Mansfield "intended to defraud" the bank. But, that finding falls short of the full import of the testimony quoted above, not elsewhere contradicted, that puts completely to rest any question of fraud, misrepresentation or bad faith.

The trial court made this finding of fact:

"On the occasion when this instant loan was made, Billy Jack Goodrich had come to the Bank of Alamo requesting the loan and it was he who drafted all legal documents required for closing the loan."

The trial court's opinion continued with the observation that Conley "testified that at all times pertinent he did not know the difference between PPC and PPLI and thought that he was dealing with one corporation . . . that he thought the loan and the certificate of deposit was made to the same company."

The trial court then proceeded with a lengthy analysis of the 1972 annual report

of PPC and its subsidiaries and concluded that the report "reinforced the impression that PPLI was operated as a division of PPC." The trial court summarized its findings and stated its conclusions as follows:

> "Mr. Conley impressed the Court as a man who made the loan in good faith, relying upon the representation of Mr. Mansfield and Mr. Goodrich, especially Mr. Goodrich, who had previously handled legal matters for the Bank of Alamo. Mr. Conley relied upon Mr. Goodrich to take care of all legal matters necessary to complete the transaction. This is not to say that Mr. Goodrich or Mr. Mansfield intended to defraud the Bank of Alamo, but simply to say that Mr. Conley relied upon their representations, and *reasonably believed* from all the circumstances that the funds represented by the certificate of deposit would be kept on deposit in the Bank of Alamo for the life of the loan, and simply represent additional security for the loan. Mr. Conley *understood* that so long as the $50,000 remained on deposit in the Bank of Alamo, the bank would have the right to set-off the deposit against the loan should it not be paid when due.

> . . . . .

> This Court finds that the funds, accounts, operations, directors, officers, and shareholders, of Peoples Protective Corporation and Peoples Protective Life Insurance Company were so closely bound together, overlapping, and interchangable, that this Court of equity should refuse to indulge the legal fiction that they were wholly separate, distinct and independent corporate entities. (Emphasis added.)

The finding that Goodrich drafted all the legal documents required and that Conley relied upon him to take care of all legal matters necessary to complete the transaction apparently served the purpose of insulating Conley from knowledge that he was making a loan to one corporation, receiving the funds of another corporation, an insurance company, and issuing a certificate of deposit to that company. There was no contention or finding that any of the documents in November or May were erroneously prepared or failed to contain any agreement that was intended to be reduced to writing.

 It was undisputed that Goodrich and Mansfield went to the Bank of Alamo on November 5, 1973, armed with an appropriate resolution of PPC authorizing the loan, a promissory note of that corporation and the insurance company's check in the sum of $50,000. Obviously they did not bring with them the check of the Bank of Alamo to PPC in the sum of $100,000 or the certificate of deposit payable to the insurance company in the sum of $50,000. The testimony of Goodrich and Mansfield was unequivocal that Conley was told to have the $100,000 check made out to Peoples Protective Corporation and the $50,000 CD payable to the insurance company. Conley's testimony was equivocal in that he admitted that that might have happened, but he thought he merely told Goodrich to instruct the bank employee that performed that function to prepare the check and CD as they should be. In view of the finding of the trial court we are required to resolve this conflict, if such it be, in favor of Conley, but that does not resolve the issue. The Bank of Alamo, not Conley, is the defendant and the party having the burden of establishing, as a defense, the one corporation theory. It is immaterial whether Conley actually issued the instructions for the preparation of the check and CD or actually observed and mentally recorded the documented fact that the bank was issuing its CD to one corporation and its check for the proceeds of the loan to another corporation. The November CD, payable to the insurance company, was signed by Patricia Nolen, assistant cashier of the bank, whose authority to sign for the bank was not questioned. The check to PPC was not made an exhibit but was obviously signed by a person authorized by the bank because it was cashed by PPC. While there is no direct evidence one way or the other, it must be presumed that the bank's internal records were kept in accord with stan-

dard bookkeeping practices, which would require the posting of a $100,000 loan debit to PPC and a $50,000 deposit credited to the insurance company. These documentary facts are binding on the Bank of Alamo and render immaterial and irrelevant Conley's thoughts about whether he was dealing with one corporation or two. The bank cannot hide behind Conley's claim that he refused to take cognizance of facts that its own documents and records reflected; nor is this Court bound by a finding of the trier of fact that accepted a senior bank officer's thoughts that were contradicted by documentary evidence.

Nevertheless, we further examine Conley's testimony bearing on the issue of whether he was justified in thinking he was dealing with one corporation. Plaintiff took a discovery deposition of Conley on January 16, 1975, and again on April 16, 1975, and those depositions were introduced as part of the plaintiff's proof at the trial. Conley also testified at the trial on September 8 and September 29, 1975.

On January 16, Conley was examined by counsel for plaintiff and testified in part as follows:

Q. Whose request or idea was it that the additional money be deposited by the other corporation? Was that your request in order to secure the $100,000 loan, or was that a suggestion made by Mr. Goodrich?

A. That was a suggestion made by Mr. Goodrich as part of the whole package.

And at the time—I'll say this. You're saying the "other corporation". At the time I didn't know there were two.

Q. Well, you thought it was one corporation at that time?

A. Well, I don't know as I even thought about a difference. It never occurred to me one way or the other.

Q. What would have been the purpose of a single corporation depositing $50,000 and borrowing $100,000?

A. Well, what they told me was they had to keep a certain amount of cash reserve on hand all the time in the amount of deposits of one type or another.

Q. Mr. Goodrich told you this or Mr. Mansfield?

A. I have no earthly idea, Robert.

Q. You don't remember which one?

A. No, I don't remember how it came up or anything about it, but, now, this was part of what I was told or led to believe and so forth in the corporation.

Of course, I didn't dream up the cash reserve that they're talking about they had to keep on hand. Now, they said that was a part of the insurance company's cash reserve.

Q. Okay. Then at some point in that conversation you had to realize they were talking about two different companies?

A. Well, I don't know whether I did or not. I don't know whether I did or not. I don't—I don't really think I did.

Q. Well

A. I don't guess I understood the workings of the corporation as well as I should have.

It is incredible if Conley, the executive vice president of the Bank of Alamo, president at the time of trial, with twenty-seven years banking experience did not realize they were talking about two different companies at that time, but, if that be true, both he and the bank were charged with that knowledge on November 5 when the documents were signed, reflecting beyond any peradventure of doubt that the loan was being made to PPC and that the "reserve fund" was deposited by, and a CD issued to, PPLI.

Another factor, not considered by either of the courts below, was the significance of Conley's admitted knowledge that the $50,000 was the insurance company's cash reserve. Mansfield testified that he and Goodrich also expressly told Conley that the insurance company's reserve "could not be tied in any way to the loan because it was funds of Peoples Protective Life Insurance Company and the insurance company could not pledge any of its assets for a corporate debt."

In *Central Sav. Ass'n v. Central Plaza Bank & Trust Co.*, 223 So.2d 50 (Fla.App.

1969), *cert. denied*, 232 So.2d 176 (1969), the court denied the right of a bank to set off a $50,000 certificate of deposit of a savings and loan association against a loan to its parent corporation that was in default, on the ground that the savings and loan was a regulated company and as such prohibited from lending its *credit*, as distinguished from lending its money.

■ The Tennessee statutes governing domestic life insurance companies severely restrict the use and investment of its assets (*see* T.C.A. §§ 56–305, 306, 307) with the underlying purpose of protecting the policy holders, just as the statutes and regulations governing banks are designed to protect depositors. PPLI was a domestic life insurance company. When a bank, acting as a lender, has knowledge that it is dealing with the reserve funds of a life insurance company we think it is charged with notice that the use of those funds is regulated and restricted for the protection of policy holders, and at the very least, it is a signal that inquiry and investigation are called for, as distinguished from "assumptions."

The Courts below gave no consideration to the fact that, after knowledge of the sale of stock of the life insurance company by PPC, the bank extended the loan to PPC and reissued the CD to the life insurance company in May, 1974.

■ This Court is not bound by the concurrent finding of fact rule with respect to material evidence that has not been the subject of specific findings by the trial judge. *City of Columbia v. C. F. W. Constr. Co.*, 557 S.W.2d 734 (Tenn.1977); *Kemp v. Thurmond*, 521 S.W.2d 806 (Tenn.1975).

In addition to the documented facts related in Section I of this opinion that show Goode had knowledge of the sale before he issued the CD to the insurance company, Conley admitted that he read an article in the Jackson Sun or the Memphis Commercial Appeal, or both, announcing the sale. The record shows that an article announcing the sale appeared on the front page of the Jackson Sun on April 21, 1974. Although Conley denied that Goodrich or

Mansfield, or anyone else, gave him "notice" of the sale, there being no finding by the lower courts, we find that the bank, through Conley and Goode, knew that the stock of PPLI was not owned by PPC, and a fortiori, that any identification of PPLI with PPC was at an end, before the extension of the loan on or about May 10, 1974, and the issuance of the CD that is the subject of this suit on May 16, 1974.

Both lower courts considered it significant that the two corporations had common officers and directors, used the same building, address, telephone number, etc., and as stated earlier, the trial court placed particular emphasis on the annual report of PPC. Conley did not testify that he read or relied upon anything in the annual report as indicating that there was only one corporation. In fact, no emphasis was put on the annual report at the trial, except that, as noted by the trial court, Mansfield stated that if Conley had read the annual report which was left with him in the summer of 1973, he would have realized that PPC and PPLI were separate corporations, and the trial judge's findings disagreed with that conclusion, as did the Court of Appeals.

What impression the annual report presented is immaterial here, in the absence of testimony from Conley that it actually deceived him, and that reasonable minds would agree that a senior bank officer would be deceived by it.

■ The trial court concluded that denying recovery "would work an injustice and cause an injury to the Bank of Alamo which has done no wrong." That conclusion will not withstand analysis. The essential fact undergirding the bank's theory of recovery is that Conley and the bank were dealing with one corporation. The bank cannot espouse that theory for one purpose and disclaim it for another. Given the one corporation theory, the borrower paid 9½% per annum on $50,000 of the bank's money and 9½% on $50,000 of its own money, and received 5½% interest on its own money, or a net return to the bank of 4% on the $50,000 of the borrower's money. Thus, the borrower paid, and the bank received, 13½%

interest for the use of the bank's money, a usurious rate. T.C.A. § 47–14–104. The illegal act of usury dispells, as a matter of law, any claim of equity in favor of the Bank of Alamo. *See* 1 Gibson's Suits in Chancery § 51 (5th ed. 1955).

We conclude that the bank has failed to carry the burden of proving the three elements necessary to invoke the instrumentality rule. The corporate structure of PPC and its subsidiaries may have been such that PPC, through common officers and directors, exercised dominion over subsidiaries, but in this transaction the facts show that PPLI had a mind of its own and that the bank knew or should have known that the insurance company's $50,000 was not deposited either as security or as a potential set off, if the loan was not paid. We further find that such control as PPC exercised over PPLI was not used to commit fraud, misrepresentation or a dishonest or unjust act upon the bank. One of the incidents of the banking business is evaluating loan risks. The conclusion to be drawn from this record is that Conley and the bank regarded PPC as a sound risk for an unsecured loan of $100,000 until sometime after May 16, 1974.

The judgment of the Court of Appeals is reversed. Judgment will be entered in this Court in favor of plaintiff against the Bank of Alamo in the sum of $50,000 plus interest from May 5, 1974 to June 5, 1974 at the rate of 5%, plus interest from June 5, 1974 to May 27, 1976 at 6%, plus interest from May 27, 1976, until paid at the rate of 8%.

HENRY, C. J., and COOPER, BROCK and HARBISON, JJ., concur.