**ELECTRIC POWER BOARD OF CHAT-TANOOGA, Plaintiff-Appellee,**

v.

**ST. JOSEPH VALLEY STRUCTURAL STEEL CORPORATION, Defendant-Appellant.**

Supreme Court of Tennessee, at Knoxville.

May 6, 1985.

---

J. Hartley Echerd, Chattanooga (Luther, Anderson, Cleary & Ruth, Chattanooga, of counsel), for defendant-appellant.

Ewing Strang, Chattanooga (Strang, Fletcher, Carriger, Walker, Hodge & Smith, Chattanooga, of counsel), for plaintiff-appellee.

## OPINION

BROCK, Justice.

This is a products liability action arising out of an accident that occurred June 12, 1979. Two employees of the Electric Power Board of Chattanooga, Wayne Autry and Jodey Bates, suffered serious personal injuries and the Power Board sustained substantial property damage when a 75 ft. aerial device, referred to as a "cherry picker," collapsed while the two men were working in its upraised bucket. Autry and Bates and their spouses brought actions for damages for personal injuries and the Power Board brought an action for property damages against Map Enterprises, Inc.,

which had sold the cherry picker to the Power Board, and Strato-Tower Corporation which had manufactured the machine. Later, the plaintiffs amended their complaints to bring St. Joseph Valley Structural Steel Corporation, appellant, into the litigation as a defendant alleging liability on the bases (1) that St. Joseph was independently negligent in the manufacture of certain parts which went into the cherry picker and (2) that the liability of Strato-Tower was imputable to St. Joseph because Strato-Tower was the mere instrumentality or alter-ego of St. Joseph.

At the conclusion of all of the evidence, the defendant St. Joseph made a motion for a directed verdict which was denied. The jury returned verdicts against all defendants in favor of the Autrys and the Bates and the Power Board. Responding to interrogatories submitted to the jury on behalf of St. Joseph, the jury found that St. Joseph was not guilty of negligence but did find that Strato-Tower was the alter-ego or instrumentality of St. Joseph and, on this basis, judgment against St. Joseph was entered. St. Joseph filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, which was denied by the trial court.

The Court of Appeals affirmed the judgments for the plaintiffs, holding that the evidence presented a jury issue respecting the question whether or not Strato-Tower was an instrumentality or alter-ego of St. Joseph. This Court granted St. Joseph's application to appeal, to consider the question:

"Whether there is any material evidence in the record which supports the jury's determination that Strato-Tower was the 'instrumentality' of St. Joseph."

In the early part of 1978, Map Enterprises, Inc. sold to the Electric Power Board of Chattanooga a 75 ft. aerial hoist which was manufactured by Strato-Tower, Inc. From the beginning, the Power Board had difficulties with the rotation of the hoist and its leveling which was controlled by rigid legs. It was decided that a hydraulic leveling device should replace the rigid legs. Strato-Tower manufactured the hydraulic leveling assembly and shipped it to the Power Board and arrangements were made for Map Enterprises to install the hydraulic device. Originally, Shannon Clements, the inventor of the aerial hoist and the Vice-President of Strato-Tower, was to be present to advise and counsel Map's employees in the installation of the new hydraulic device, but Dean Kelly, the President of Strato-Tower and also the President of St. Joseph Valley Structural Steel Corporation, discussed the situation with Mr. Clements and directed Clements not to go to Chattanooga to supervise the installation of the leveling device.

On or about November 14, 1978, C.H. Wilson, an employee of Map, did go to Chattanooga and installed the new hydraulic system. Wilson had considerable difficulty with the new hydraulic system and he telephoned Mr. Clements and informed him that the hydraulic unit had been manufactured upside down, in response to which Clements advised Wilson to turn the device over. In a second telephone call, Wilson explained to Clements that the hydraulic lift would not fit the cherry picker and later, in a third telephone conversation, Wilson advised Clements that a weld would not permit the shaft of the hydraulic device to fit between the parallel pieces of steel described as "ears." Mr. Clements instructed Wilson to trim off enough of the sides of the ears so that the weld and the cylinder shaft would have room to fit. Wilson proceeded to cut off approximately ½ of the ears, eliminating three of the four holes in each ear. Wilson testified that he trimmed the ears down to the level of the bed of the truck because he felt it looked neater.

On June 12, 1979, Bates and Autry were operating the hoist when it collapsed and fell to the ground. There was expert testimony that the removal of the holes from the ears weakened the structure and caused a separation from the frame of the truck. Shannon Clements testified that if he had gone to Chattanooga for the installation of the leveling device, the ears on the

device would not have been cut to the extent they were cut by Wilson. There was also other expert testimony that the manner in which the modifications were made and the installation of the hydraulic system caused a binding of the leveling device against the bed of the truck thereby causing the metal to break. An expert witness also testified that immediately prior to the accident the aerial hoist was defective and unreasonably dangerous.

Dean Kelly, President of St. Joseph and Strato-Tower, ordered Shannon Clements, the Vice-President and "Manager" of Strato-Tower not to go to Chattanooga to supervise the installation of the hydraulic leveling device which failed causing the accident. Kelly claims that he gave this order to Clements purely to avoid the expense of the trip to Chattanooga and that he gave the order as the President of Strato-Tower, not as the President of St. Joseph.

Evidence was also introduced that after the cherry picker collapsed, Dean Kelly, as President of St. Joseph Valley Structural Steel Corporation, ordered an employee of that corporation, Dr. Clifford Aides, to go to Chattanooga to investigate the failure and to produce a stress analysis; that Dr. Aides, after investigating the aerial device and its failure, fabricated and back dated "specifications" consistent with the actual construction of the aerial device which "specifications" differed from the true specifications.

St. Joseph owned 81% of the stock of Strato-Tower, the remaining 19% being owned by Shannon Clements, who was the Vice-President and founder of Strato-Tower which had been a going concern under different names but under Mr. Clements' direction since the 1950s. In 1973 St. Joseph and Mr. Clements took over Strato-Tower which was then known as "Daybrook" by purchasing its inventory and "engineering," and, Strato-Tower was made a subsidiary of St. Joseph. The purpose in having Strato-Tower separately incorporated from St. Joseph was to insulate St. Joseph from the risk of products liability litigation resulting from the manufacture of aerial hoists. Strato-Tower was capitalized at its beginning with only $10,000.00 plus patents contributed by Mr. Clements which were valued at $2,300.00. When Strato-Tower was first created it carried liability insurance but at the time of the accident on June 12, 1979, there was no liability insurance in effect.

Dean Kelly was the President of both of these corporations and his wife was Secretary of both corporations; Mr. Clements served as Vice-President and as a director, along with the Kellys, of Strato-Tower. Mr. Dean Kelly signed checks for both corporations and both corporations maintained separate accounts in the same bank and maintained separate payroll accounts. Both corporations employed the same bookkeeper and shop superintendent and one employee, Dr. Aides, was "farmed out" by St. Joseph to Strato-Tower. Dr. Aides, an engineer, furnished engineering design services to Strato-Tower, keeping a record of the amount of time he spent on Strato-Tower projects so that St. Joseph could charge Strato-Tower for its services. Mr. & Mrs. Kelly owned the building which housed both corporations. Separate leases from the Kellys to each of the two corporations were employed and each of the corporations maintained separate work areas and offices in the building and Strato-Tower owned its own machinery but it also shared some equipment with St. Joseph. A single overhead crane was shared and employed by both corporations. The two corporations had the same address but different telephone numbers. Each employed on the average between 25 and 30 employees.

In 1978 when the subject matter of this litigation arose, Strato-Tower was insolvent, owing $84,000.00 to banks and owing $725,000.00 to its parent, St. Joseph. At the time of its dissolution a short time later Strato-Tower's debt to St. Joseph had risen to over $1,000,000.00.

Following its incorporation Strato-Tower made a small profit in the years 1973, 1974 and 1975 but never paid a dividend. Following insolvency, Strato-Tower's assets were sold at a bulk sale for $289,000.00.

Throughout its existence, Strato-Tower Corporation was primarily financed by St. Joseph.

The jury by its special verdict has found that Strato-Tower Corporation is the mere instrumentality of St. Joseph; the trial judge has approved that verdict and has adjudged that the corporate entity of Strato-Tower is to be disregarded and St. Joseph held liable for the damages assessed against Strato-Tower. The Court of Appeals has affirmed these findings and judgment of the trial court.

■ A corporation, of course, has an existence separate and distinct from that of the owners of its capital stock, but this separate entity may be disregarded upon the showing of special circumstances, such as, that the corporation is a sham or dummy so that failure to disregard it would result in an injustice. *Fidelity Trust Co. v. Service Laundry Co.,* 160 Tenn. 57, 22 S.W.2d 6 (1929); *American Indemnity Co. v. Southern Missionary Col.,* 195 Tenn. 513, 260 S.W.2d 269, 39 A.L.R.2d 714 (1953); *Tennessee Consol. Coal Co. v. Home Ice & Coal Co.,* 25 Tenn.App. 316, 156 S.W.2d 454 (1941); *Neese v. Fireman's Fund Insurance Company,* 53 Tenn.App. 710, 386 S.W.2d 918 (1964).

In our most recent case discussing the circumstances which will cause a court to disregard the separate entity of a subsidiary corporation and fix its liability on the parent corporation, we said:

"... application of the instrumentality rule requires proof of the following three elements:

"(1) The parent corporation, at the time of the transaction complained of, exercises complete dominion over its subsidiary, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the corporate entity, as to that transaction, had no separate mind, will or existence of its own.

"(2) Such control must have been used to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights.

"(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." *Continental Bankers Life, Etc. v. Bank of Alamo,* Tenn., 578 S.W.2d 625, 632 (1979).

*See also,* 7 Tennessee Jurisprudence 235–236, *Corporations,* § 3 (1983); 18 Am. Jur.2d, *Corporations,* § 17 (1965); 63 Am. Jur.2d, *Products Liability,* § 166 (1984).

■ The conditions under which the corporate entity will be disregarded vary according to the circumstances present in each case and the matter is particularly within the province of the trial court. Moreover, a determination of whether or not a corporation is a mere instrumentality of an individual or a parent corporation is ordinarily a question of fact for the jury. *Trans-American Communications, Inc. v. Nolle,* 134 Ga.App. 457, 214 S.E.2d 717 (1975); *Alexander v. Abbey of The Chimes,* 104 Cal.App.3d 39, 163 Cal.Rptr. 377 (1980).

■ It is the long established rule in this state that in reviewing a judgment based upon a jury verdict the appellate courts are not at liberty to weigh the evidence to decide where the preponderance lies, but are limited to determining whether there is material evidence to support the verdict; the appellate court is required to take the strongest legitimate view of all of the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary. Having thus examined the record, if there be any material evidence to support the verdict, it must be affirmed; if it were otherwise, the parties would be deprived of their constitutional right to trial by jury. *Crabtree Masonry Co. v. C & R Const., Inc.,* Tenn., 575 S.W.2d 4, 5 (1978); *City of Chattanooga v. Rogers,* 201 Tenn. 403, 299 S.W.2d 660 (1956); *D.M. Rose & Co. v. Snyder,* 185 Tenn. 499, 206 S.W.2d 897 (1947).

Having considered the evidence in accordance with these principles, we conclude that material evidence supports the verdict of the jury that Strato-Tower was the mere instrumentality of St. Joseph as the instrumentality doctrine is set out in *Continental Bankers Life, Etc. v. Bank of Alamo, supra,* and our other cases cited.

Of course, all of the facts have some effect, but we think it is particularly significant that at the time of this accident Strato-Tower owed St. Joseph $725,000.00, or more, and was insolvent. The jury may well have concluded that Strato-Tower was operating as a mere division or department of St. Joseph, and had been doing so for some time, and was being totally dominated by St. Joseph. That conclusion is further supported by the fact that when the cherry picker collapsed, Dean Kelly, as President of St. Joseph, dispatched a St. Joseph employee, Dr. Aides, to go to Chattanooga and investigate the collapse and produce a stress analysis, that Aides did so, fabricating and back dating phony "specifications" that complied with the actual construction of the cherry picker which had not been constructed in accordance with the true specifications. *Compare: Trans-American Communications, Inc. v. Nolle, supra.*

Finding no error in the decisions of the trial and appellate courts, we affirm them and tax costs against the defendant-appellant and surety.

COOPER, C.J., and FONES, HARBISON and DROWOTA, JJ., concur.