IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 9, 2000 Session

## C.M. REAGAN v. IMA J. CONNELLY, ET AL.

**Appeal from the Chancery Court for Hamilton County**
**No. 97-1256     W. Frank Brown, III, Chancellor**

### FILED NOVEMBER 6, 2000

### No. E2000-00451-COA-R3-CV

---

C.M. Reagan filed this action seeking to collect a money judgment previously obtained against the defendant Dan Connelly ("Connelly"), which judgment was based upon Connelly's guaranty of a note executed by his brother-in-law. Following a bench trial, the court below found that Connelly had fraudulently conveyed three pieces of real property to the defendant corporation, Dan Connelly, Inc. ("the Corporation"). With respect to a fourth piece of property, the trial court found that its transfer to the Corporation was not fraudulent. The trial court, however, went on to disregard the separate identity of the Corporation and find that 96% of the value of the fourth piece of property was available to satisfy the underlying judgment. This determination was based upon the trial court's finding that Connelly owned that percentage of the Corporation's stock. The Corporation and its record shareholders appeal. We affirm in part and reverse in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part; Reversed in Part; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

N. Darrell Bridges, Chattanooga, Tennessee, for the appellants, Ima J. Connelly, Traci Connelly, Casey Connelly, and Dan Connelly, Inc.

Scott N. Brown, Jr., Stephany S. Pedigo, and Timothy J. Millirons, Chattanooga, Tennessee, for the appellee, C.M. Reagan.

### OPINION

I.

Connelly formed the Corporation in 1982 for the purpose of providing for his children in the event "anything happened" to him. Connelly received four shares of stock in the Corporation, and the remaining 96 shares were distributed in equal parts to "Dan Connelly Trustee for Casey Connelly

[UGMA],"[1] and "Dan Connelly Trustee for Traci Connelly [UGMA]." When Connelly married Ima Connelly ("Mrs. Connelly") in 1985, he transferred his four shares of stock to her as a wedding gift. Prior to the commencement of this litigation, Casey Connelly and Traci Connelly both reached the age of majority; despite this, the record is clear that Connelly failed to deliver the certificates to Casey and Traci, children from an earlier marriage.

In 1991, the plaintiff Reagan sold his auto parts store and the real estate on which it was located to Troy Malone, Connelly's brother-in-law. Malone and his wife signed two separate promissory notes to Reagan, one for the real estate and one for the business and the associated personal property. Connelly personally guaranteed the note for the purchase of the business and personalty. He did not guarantee the other note.

In the early part of 1994, the Malones failed to make three payments due Reagan. Their default prompted a meeting among Reagan, his attorney, the Malones, and Connelly. As a result of that meeting, the Malones agreed to quitclaim the real estate back to Reagan in satisfaction of the real property note. They also agreed to move the remaining inventory of parts to their home, a decision with which Connelly disagreed. The note relating to the business and personalty remained in effect and the Malones continued to remit payments on this obligation.

In April, 1996, Connelly and Jim Watkins, who owned, as equal partners, an office building complex known as the Chase Center, agreed that Connelly would buy out Watkins' share of the complex. Connelly sought and obtained a $550,000 loan from a bank, and on April 30, 1996, Watkins' half interest in the property was transferred to Connelly and Mrs. Connelly. The total amount due at the closing of this transaction was $567,829.20. This obligation was met by way of the $550,000 loan, which designated Connelly as the borrower, and a $17,829.20 check drawn on the Corporation's checking account. Of the total purchase price, excluding closing costs, $459,764.17 was applied to the original mortgage on the property and $107,617.91 was paid to Watkins.

First Title Insurance Company handled the Chase Center transaction. Connelly testified at trial that two or three months after the closing, he learned that First Title Insurance Company had "mistakenly" prepared the documentation in Connelly's individual name rather than in the name of the Corporation.

In the meantime, the Malones had been paying Reagan on the business and personalty note. By mid-1996, however, they were again behind in their payments, being three months in arrears. On August 7, 1996, Reagan's attorney sent letters to the Malones and Connelly advising them that if the note was not brought up to date, Reagan would invoke the note's acceleration clause.

On August 14, 1996, Connelly and his wife quitclaimed the Chase Center property to the Corporation, curing the closing agent's "mistake" of preparing the documentation in Connelly's

---

[1] "UGMA" is a reference to the Tennessee Uniform Gifts to Minors Act, T.C.A. § 35-7-201 et seq. (1991).

name. Connelly explained at trial that he received no consideration for the transfer of this property because there was no equity in the property at that time.

The Corporation was basically dormant from the time of its formation until sometime in the first half of the 1990s. It then filed numerous tax returns and the necessary paperwork to get reinstated with the State of Tennessee. On a subsequent return, Connelly explained that the Corporation owned nothing and conducted no business during the 1995 tax year. In fact, Connelly had reported rental income and expenses from a property known as Perimeter Park on his personal tax return for tax year 1995. Connelly had acquired Perimeter Place for $90,000 in October, 1994, using his personal funds. It was quitclaimed to the Corporation in December, 1994. Connelly received no consideration for the transfer of the property to the Corporation until May or June, 1997, when the Corporation paid him $100,000. At the time of the hearing, Connelly's tax preparer testified that the income and expenses of Perimeter Park were to be included in an amended 1996 corporate tax return.

On August 29, 1996, the Corporation purchased a car wash from Car Masters, Inc. The Corporation borrowed $500,000 of the purchase price, paid approximately $98,000 cash, and gave a $30,000 note to the seller.

On August 16, 1996, the Malones executed a deed of trust on their home in favor of Connelly to secure payment of a $50,000 debt owed by the Malones to Connelly. Then, on October 15, 1996, Connelly released the deed of trust and the Malones quitclaimed the property to the Corporation. The Corporation then executed a deed of trust on the property in favor of SunTrust Bank to secure the payment of a debt in the amount of $64,871.73. Connelly signed the note to SunTrust as the borrower.

When the Malones failed to make their payments on the remaining note to Reagan, Reagan filed suit against them. Connelly was also named as a defendant. He was served with process on or about September 10, 1996. Reagan ultimately prevailed and was awarded a judgment against the Malones and Connelly in the amount of $170,585.07. Reagan was unable to collect the judgment, and he filed the instant action on December 23, 1997.

At trial, Connelly testified that he is the president of the Corporation. He stated that he receives compensation for his services on an irregular basis, depending on the availability of cash in the Corporation. He also testified that Mrs. Connelly "has been the secretary for a long period of time." However, in Mrs. Connelly's deposition, which was admitted into evidence at trial, she testified that she did not know whether she was an officer or even whether she owned any stock in the Corporation. She also stated that "I just sign whatever [Connelly] wants me to sign and that's it." The children have never attended a meeting and have never voted or contributed anything to the Corporation. Neither the children nor Mrs. Connelly attended the trial.

The trial court specifically found that the transfers of Perimeter Park, the Chase Center, and the Malones' property to the Corporation were fraudulent; it concluded, however, that the transfer

of the car wash to the Corporation was not fraudulent. The court further found that, while "the initial issuance of the stock to Mr. Connelly for the children was [not] in any way, shape, form or fashion fraudulent or wrongful," Connelly "did not intend for the children to be the present owners/possessors of rights" in the Corporation.

The court then ordered that, for the purpose of satisfying Reagan's judgment against Connelly, three of the four properties -- Perimeter Park, the Chase Center, and the Malones' property -- were to be treated as belonging exclusively to Connelly "due to Mr. Connelly's ownership prior to his transfer to the corporation," *i.e.*, because they were fraudulently conveyed to the Corporation. The remaining corporate assets, including the car wash, were to be treated as belonging four percent to Mrs. Connelly while the remaining 96 percent would be available to satisfy Reagan's judgment. This latter order is apparently based on the trial court's finding that Connelly, and not his children, is the actual owner of 96% of the stock of the Corporation.

Mrs. Connelly, Connelly's two children, and the Corporation now appeal.

II.

In this non-jury case, our review is *de novo* upon the record, with a presumption of correctness as to the trial court's factual determinations, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). The trial court's conclusions of law, however, are reviewed *de novo* with no presumption of correctness. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993). Our *de novo* review is subject to the well-established principle that the trial court is in the best position to assess the credibility of the witnesses; accordingly, such determinations are entitled to great weight on appeal. *Massengale v. Massengale*, 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991).

III.

A.

Defendants argue that the trial court erred in finding the transfers of Perimeter Park, the Chase Center, and the Malones' property to the Corporation were fraudulent conveyances. We agree with the trial court.

In Tennessee, a conveyance is fraudulent, and therefore void, if it is made "[w]ithout a fair consideration, leaving the grantor insolvent; or … [m]ade with actual intent to hinder, delay, or defraud creditors." *Hicks v. Whiting*, 149 Tenn. 411, 444, 258 S.W. 784, 796 (1924). The question of whether a conveyance is fraudulent depends on the facts and circumstances of each case and is normally proven by circumstantial evidence. *Macon Bank and Trust Co. v. Holland*, 715 S.W.2d 347, 349 (Tenn. Ct. App. 1986). Circumstantial evidence indicating fraud in a conveyance is often

termed a "badge of fraud," and has been described as "any fact that throws suspicion on the transaction and calls for an explanation." *Id*. More specifically, Tennessee courts have found the following to constitute badges of fraud:

> 1.  The transferor is in a precarious financial condition.
>
> 2.  The transferor knew there was or soon would be a large money judgment rendered against the transferor.
>
> 3.  Inadequate consideration was given for the transfer.
>
> 4.  Secrecy or haste existed in carrying out the transfer.
>
> 5.  A family or friendship relationship existed between the transferor and the transferee(s).
>
> 6.  The transfer included all or substantially all of the transferor's nonexempt property.
>
> 7.  The transferor retained a life estate or other interest in the property transferred.
>
> 8.  The transferor failed to produce available evidence explaining or rebutting a suspicious transaction.
>
> 9.  There is a lack of innocent purpose or use for the transfer.

***Stevenson v. Hicks (In re Hicks)***, 176 Bankr. 466, 470 (Bankr. W.D. Tenn. 1995) (citing the rulings in several Tennessee appellate decisions).

The presence of one or more of the badges of fraud gives rise to a presumption of fraud and consequentially shifts the burden of disproving fraud to the defendant. *See **Macon Bank***, 715 S.W.2d at 349.

We do not find that the evidence preponderates against the trial court's finding that Perimeter Park, the Chase Center, and the Malones' property were fraudulently transferred to the Corporation. With respect to Perimeter Park, Reagan presented evidence that the property was initially titled in Connelly's name and that the only consideration given by the Corporation to Connelly was a note for $100,000. Connelly attempted to rebut the circumstantial evidence of fraud by testifying that the note was indeed paid two years later and that the transfer occurred two years prior to the incident triggering his liability in this case. It is true that Perimeter Park was transferred almost two years prior to Reagan's acceleration of the Malones' debt, but it is also true that the transfer was after the Malones' first default. This evidence of the first default was sufficient to make Connelly uneasy

about his outstanding guaranty and his potential liability under it. When this is factored into the other circumstances surrounding Perimeter Park and its transfer to the Corporation, we cannot say that the evidence preponderates against the trial court's determination that Connelly's transfer of this property to the Corporation was fraudulent.

We view the evidence relating to the other two properties -- the Chase Center and the Malones' property -- in a similar fashion. Reagan presented sufficient evidence to raise a suspicion of fraud. The temporal proximity of the second letter of default and the transfers of the properties is particularly troubling. Connelly attempted to rebut the inference of fraud by introducing evidence suggesting otherwise. The trial court, in both instances, found that Connelly's rebuttal evidence was insufficient to carry his burden of disproving fraud. We cannot say that the evidence preponderates against the trial court's determination that the Chase Center and the Malones' property were fraudulently conveyed to the Corporation.

We affirm the judgment of the trial court finding that the transfers of the aforesaid three pieces of property were fraudulent as to Reagan.

B.

Defendants also argue that the trial court erred in holding that the two children did not have a valid present ownership interest in the Corporation in 1982 when that entity was originally formed. On this point, we agree with the defendants.

Under the Tennessee Uniform Gifts to Minors Act, T.C.A. § 35-7-101 et seq. (1991) ("UGMA"), one can make a gift "of a security in registered form, by registering it in the name of the donor…followed, in substance, by the words: 'as custodian for _____ (name of minor) under the Tennessee Uniform Gifts to Minors Act.'" T.C.A. § 35-7-103(a)(1). A gift made in this manner is irrevocable and has the effect of indefeasibly vesting legal title to the security in the minor. T.C.A. § 35-7-104(a). The custodian is to deliver the custodial property to the minor when the minor attains the age of eighteen. T.C.A. § 35-7-105(d).

The UGMA was repealed in 1992, and the Tennessee Uniform Transfers to Minors Act, T.C.A. § 35-7-201 et seq. (1996) ("UTMA"), was enacted in its place. T.C.A. § 35-7-225. The UTMA expressly "applies to all transfers made before October 1, 1992, in a manner and form prescribed in the [UGMA]," unless such an application would impair constitutionally vested rights or extend the custodianship's duration beyond the minor's eighteenth birthday. T.C.A. § 35-7-223. The UTMA, like the UGMA, provides that a transfer complying with the statutory requirements is irrevocable and has the effect of indefeasibly vesting legal title to the security in the minor. T.C.A. § 35-7-212(b). The UTMA, in a provision similar to one found in the UGMA, provides that the custodian shall transfer "in an appropriate manner" the custodial property to the minor upon the minor attaining a certain age. T.C.A. § 35-7-221(1) (Supp. 1999). The validity of a transfer is expressly not affected by failure of the transferor to comply with sections in the UTMA relating to "possession and control." T.C.A. § 35-7-212(a).

We find and hold that the trial court erred in finding that Connelly's children did not have a valid ownership interest in the Corporation as of the date of the initial transfer under the UGMA. The stock certificates were issued to "Dan Connelly Trustee for Traci Connelly [UGMA]" and to "Dan Connelly Trustee for Casey Connelly [UGMA]." We find that this is an effective transfer to Connelly, as custodian for his children, under the UGMA. Thus the transfers to the custodian are irrevocable and they indefeasibly vest legal title to the stock in the children. Repeal of the UGMA and the enactment of the UTMA has no legal effect on this transfer. Connelly's failure to deliver the certificates to his children when they attained the age of majority is a failure in his role as custodian and does not affect the initial transfer. We therefore find and hold that the Corporation's stock is owned four percent by Mrs. Connelly and 96% by Connelly's children.

C.

Finally, Defendants argue that the trial court erred in its treatment of the car wash. The trial court, after finding that 96% of the Corporation's stock was presently owned not by Connelly's children but by Connelly himself, then disregarded the Corporation's separate identity and ordered that the car wash was to be treated as belonging four percent to Mrs. Connelly while the remaining 96% would be available to satisfy Reagan's judgment. We find and hold that disregarding the Corporation's separate identity is improper under the facts of this case.

A corporation is presumptively treated as a distinct entity, separate from its shareholders, officers, and directors. *Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991). A corporation's separate identity may be disregarded or "pierced", however, "upon a showing that it is a sham or a dummy or where necessary to accomplish justice." *Id*.

Courts are directed to disregard a corporation's identity "with great caution and not precipitately." *Id*. The determination of whether to disregard the corporate fiction depends on the special circumstances of each case. *Electric Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn. 1985). The party wishing to pierce the corporate veil has the burden of showing facts sufficient to warrant such an action. *Schlater*, 833 S.W.2d at 925.

There are two distinct classes of cases involving the disregarding of the corporate identity. Most commonly, a corporation's veil is pierced for the benefit of creditors of the corporation, allowing them to proceed against the individuals who are the "true owners of the entity." *See, e.g., Muroll Gesellschaft M.B.H. v. Tennessee Tape, Inc.*, 908 S.W.2d 211, 213 (Tenn. Ct. App. 1995). The second class of piercing cases involves what is often referred to as "reverse piercing." In *Manufacturers Consolidation Service, Inc. v. Rodell*, C/A Nos. W1998-00889-COA-R3-CV, W1998-00882-COA-R9-CV, 2000 WL 286727 (Tenn. Ct. App. W.S., filed March 10, 2000), we explained the distinction between the more common piercing cases and the less common reverse-piercing cases as follows:

> [W]hereas piercing analysis typically "is used to hold individuals liable for the actions of a corporation they control," reverse piercing "seeks to hold a corporation accountable for actions of its shareholders."

*Id*. 2000 WL at \*16 n. 12 (quoting ***American Fuel Corp. v. Utah Energy Dev. Co.***, 122 F.3d 130, 134 (2d Cir.1997)). The Supreme Court, in ***Continental Bankers Life Ins. Co. of the South v. Bank of Alamo***, 578 S.W.2d 625 (Tenn. 1979), implicitly found that a corporation's separate identity could be pierced in reverse. *See id*. at 632-33. That case, however, dealt with the concept in the context of a corporate parent/subsidiary relationship. *See id*. This kind of relationship is different from a corporation/shareholder relationship. *See **Schlater***, 833 S.W.2d at 925. The only Tennessee case we have found dealing with reverse piercing in the context of the corporation/shareholder relationship is ***Manufacturers Consolidation***, in which we stated that "[a]lthough some courts apparently have embraced the 'reverse piercing' doctrine, others have expressed concerns about adopting this theory, describing it as 'potentially problematic' or 'controversial.'" ***Id***., 2000 WL at \*16 n. 12. (citing, *inter alia*, ***Floyd v. IRS***, 151 F.3d 1295, 1300 (10th Cir. 1998).[2]

We are of the opinion that disregarding the Corporation's separate identity in this case is improper. Not only are there significant problems inherent in the reverse piercing concept in the corporation/shareholder context, we find it particularly troubling where, as here, a plaintiff is attempting to reach the assets of the corporation to satisfy the debt of one who, as we have already found, is not even a shareholder. Thus, even should the Tennessee Supreme Court adopt the theory of reverse piercing in the corporation/shareholder context -- a decision that must await another day -- the facts of the instant case do not fall within the elements of such a cause of action.

---

[2]The following are some of the problems the court in ***Floyd*** associated with the reverse piercing concept:

> 1. The theory "bypasses normal judgment-collection procedures whereby judgment creditors attach the judgment debtor's shares in the corporation and not the corporation's assets." ***Floyd***, 151 F.3d at 1299 (quoting ***Cascade Energy & Metals Corp. v. Banks***, 896 F.2d 1557,1577 (10th Cir. 1990).
>
> 2. Innocent third party corporate creditors or shareholders may be unfairly prejudiced if a corporation's identity is reverse-pierced. ***Floyd***, 151 F.3d at 1299.
>
> 3. "[T]he prospect of losing out to an individual shareholder's creditors will unsettle the expectations of corporate creditors who understand their loans to be secured -- expressly or otherwise -- by corporate assets. Corporate creditors are likely to insist on being compensated for the increased risk of default posed by outside reserve-piercing claims, which will reduce the effectiveness of the corporate form as a means of raising credit." ***Id***.
>
> 4. Other theories, such as agency, may be sufficient to remedy any inequity caused by an individual dominating a corporation. ***Id***. At 1300.

-8-

IV.

We affirm the trial court's finding that Perimeter Park, the Chase Center, and the Malones' property were fraudulently transferred by Connelly to the Corporation. With respect to the trial court's treatment of the car wash, we reverse. The car wash is a corporate asset and is not available to satisfy the plaintiff's judgment against Connelly. The case is remanded for entry of an order consistent with this opinion and collection of costs assessed below, all pursuant to applicable law. Costs on appeal are taxed two-thirds to the appellants and one-third to the appellee.

_____
CHARLES D. SUSANO, JR., JUDGE