COURT OF APPEALS OF TENNESSEE

AT KNOXVILLE

FILED

April 14, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| RUTH FRIAR, | ) | C/A NO. 03A01-9710-CV-00470 |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | APPEAL AS OF RIGHT FROM THE |
| | ) | ANDERSON COUNTY CIRCUIT COURT |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| THE KROGER COMPANY, | ) | |
| | ) | HONORABLE JAMES B. SCOTT, JR. |
| Defendant-Appellant. | ) | JUDGE |

For Appellant                          For Appellee

ARCHIE R. CARPENTER              BRUCE D. FOX
CHRISTOPHER HEAGERTY             Ridenour, Ridenour & Fox
Carpenter & O'Connor             Clinton, Tennessee
Knoxville, Tennessee
                                 JOHN A. DAY
                                 DONALD CAPPARELLA
                                 Branham & Day, P.C.
                                 Nashville, Tennessee

O P I N I O N

AFFIRMED AND REMANDED                          Susano, J.

Ruth Friar sued The Kroger Company ("Kroger") seeking damages for personal injuries sustained when she fell in Kroger's Oak Ridge store. The trial court approved the jury's verdict for the plaintiff and entered judgment in her favor for $210,000. Kroger appealed, presenting the following issues, as taken verbatim from its brief:

> 1.  That there is no evidence upon which to sustain a verdict for the Plaintiff and that it was error for the Court to allow argument about and instruct the jury about notice by method of operation.
>
> 2.  That it was error for the court to allow Plaintiff's attorney to discuss in Voir Dire other similar cases with large verdicts.
>
> 3.  That it was error for the Court to tell the Jury that it should reduce any damages awarded by the percentage of fault attributed to the Plaintiff and direct it to do so on the verdict form.

I.

We embark upon our review of the facts in this case ever mindful of the limited nature of our appellate jurisdiction in jury cases:

> It is the long established rule in this state that in reviewing a judgment based upon a jury verdict the appellate courts are not at liberty to weigh the evidence to decide where the preponderance lies, but are limited to determining whether there is material evidence to support the verdict; the appellate court is required to take the strongest legitimate view of all of the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary. Having thus examined the record,

2

> if there be any material evidence to support the verdict, it must be affirmed; if it were otherwise, the parties would be deprived of their constitutional right to trial by jury. [Citations omitted].

*Electric Power Board of Chattanooga v. St. Joseph Valley Structural Steel Corporation*, 691 S.W.2d 522, 526 (Tenn. 1985). *See also* **Truan v. Smith**, 578 S.W.2d 73, 74 (Tenn. 1979). Our role is clear: we must scour the record in search of evidence of facts, and reasonable inferences from facts, that tend to support the verdict for the plaintiff. In the process, we must ignore facts that tend to support Kroger's defensive positions. Our inquiry into the facts ends if and when we find material evidence to support the jury's verdict, regardless of the quantum of evidence to the contrary.

## II.

On the morning of November 21, 1994 -- Monday of Thanksgiving week -- the plaintiff, who was then approximately 72 years old, went to Kroger's Oak Ridge store to shop for Thanksgiving dinner. She found the store crowded with shoppers. She had been shopping in the store for about 20 minutes when she went to the store's dairy section. This section is generally located in the back left corner of the store.[1] According to Kroger's drawn-to-scale diagram of the internal layout of the store, the dairy section includes a multi-door upright cooler containing milk, orange juice, and the like, located along the

---

[1]All references in this opinion to parts of the store are from the perspective of one on the outside facing the front of the store.

3

left back wall of the store; an open dairy case with biscuits, butter, and similar products that runs along the left wall on a diagonal from the back wall; and two free-standing, open-at-the-top dairy coolers with cheese products, which coolers are parallel with and eleven feet out from the open dairy case.

The plaintiff selected a few items from the open dairy case along the left wall. As she stepped back from the dairy case toward one of the free-standing dairy coolers, she stepped in something that caused her to fall. As a result of the fall, the plaintiff broke her hip and kneecap. The "something" in which the plaintiff stepped was a piece of cardboard laid over the remnants of a dropped glass jar of turkey gravy.

III.

Generally speaking, the owner or operator of premises is subject to liability for allowing a dangerous or defective condition to exist on its premises if the condition (1) was created by it or its agent, or (2) was created by someone other than the proprietor or its agent and the proprietor had actual or constructive notice that the condition existed prior to the accident. *Hardesty v. Service Merchandise Co*., 953 S.W.2d 678, 682 (Tenn.App. 1997), *perm. app. denied*; *Martin v. Washmaster Auto Center, U.S.A.*, 946 S.W.2d 314, 318 (Tenn.App. 1996), *perm. app. denied*; *Chambliss v. Shoney's Inc*., 742 S.W.2d 271, 273 (Tenn.App. 1987); *Jones v. Zayre, Inc.*, 600 S.W.2d 730, 732 (Tenn.App. 1980).

4

In the instant case, there is absolutely no evidence that a Kroger employee dropped the jar of turkey gravy or was otherwise directly responsible for creating the condition that caused the plaintiff to fall. Therefore, we will not further discuss this aspect of a proprietor's liability.

The liability of a business proprietor to a customer for a dangerous condition created by someone other than the proprietor or its agent is addressed in the case of **Simmons v. Sears, Roebuck & Co.**, 713 S.W.2d 640 (Tenn. 1986):

> The duty owed by a business proprietor to a customer "is to exercise reasonable care to keep the premises in a reasonably safe and suitable condition, including the duty of removing or warning against a dangerous condition traceable to persons for whom the proprietor is not responsible... if the circumstances of time and place are such that by the exercise of reasonable care the proprietor should have become aware of such condition."

*Id*. at 641 (citing **Allison v. Blount Nat'l Bank**, 390 S.W.2d 716, 718 (Tenn.App. 1965)).

Generally speaking, a proprietor's liability for a dangerous condition that is "traceable to persons for whom the proprietor is not responsible," *see* **Simmons**, 713 S.W.2d at 641, is based upon the proprietor's actual or constructive notice of the dangerous condition. In order to predicate liability on actual notice, there must be evidence from which the jury could conclude that the defendant had actual notice prior to the accident such that it had a reasonable opportunity to correct or

5

warn against the condition before the accident occurred. *See City of Knoxville v. Ferguson*, 241 S.W.2d 612, 615 (Tenn.App. 1951).

The basic rule of constructive notice in premises liability cases is this: "[i]f liability is to be predicated on constructive knowledge by the Defendant, the proof must show the dangerous or defective condition existed for such length of time that the Defendant knew, or in the exercise of ordinary care should have known, of its existence," *Hardesty*, 953 S.W.2d at 682; *Martin*, 946 S.W.2d at 318; *Ogle v. Winn-Dixie Greenville, Inc.*, 919 S.W.2d 45, 46 (Tenn.App. 1995); *Chambliss*, 742 S.W.2d at 273; *Jones*, 600 S.W.2d at 732; *Self v. Wal-Mart Stores, Inc.*, 885 F.2d 336, 338-39 (6th Cir. 1989); or, stated another way, "there must be material evidence from which the trier of fact could conclude the condition existed for sufficient time and under such circumstances that one exercising reasonable care and diligence would have discovered the danger." *Paradiso v. Kroger Co.*, 499 S.W.2d 78, 79 (Tenn.App. 1973); *Beske v. Opryland USA, Inc.*, 923 S.W.2d 544, 546 (Tenn.App. 1996), *perm. app. denied*.

It has been held that "[w]here there is a complete absence of proof as to when and how the dangerous condition came about, it would be improper to permit the jury to speculate on these vital elements." *Hardesty*, 953 S.W.2d at 683; *Ogle*, 919 S.W.2d at 47; *Chambliss*, 742 S.W.2d at 273; *Paradiso*, 499 S.W.2d at 80. Thus, to establish constructive notice on the part of the defendant, the plaintiff must make some showing as to the length

6

of time that the dangerous condition was present prior to the accident. ***Hardesty***, 953 S.W.2d at 682, 683***; Self***, 885 F.2d at 338. However,

> [t]he length of time the condition existed is not the only factor to be considered in determining whether or not the proprietor had constructive notice of the danger. One must take into consideration the nature of the business, its size, the number of patrons, the nature of the danger, [and] its location along with the foreseeable consequences.

***Paradiso***, 499 S.W.2d at 79; ***Allison***, 390 S.W.2d at 719.

The above rules regarding constructive notice generally apply "in slip and fall cases involving a 'transitory, temporary or unusual' defect, condition or accumulation of foreign substances on floors." ***Stinson v. Wal-Mart Stores, Inc.***, No. 1:95-CV-232, slip op. at 3 (E.D.Tenn. June 7, 1996), *aff'd*, 124 F.3d 199 (6th Cir. 1997)(no published opinion)(citing ***Self***, 885 F.2d at 339). However, in cases in which the presence of the particular hazardous condition is shown to be a common -- rather than a transitory -- occurrence, the requirement of notice is satisfied where the plaintiff proves that "the defendant's method of operation created a hazardous situation foreseeably harmful to others." ***Martin***, 946 S.W.2d at 318. This "method of operation" theory has been stated as follows:

> [w]here a proprietor knows or has reason to know that his customers are regularly dropping hazardous debris on his floor or steps, the Tennessee cases teach that the proprietor must take reasonable precautions

7

>           to protect customers from injuring themselves
>           on it.

**Self**, 855 F.2d at 339.

Under the method of operation theory, the questions to be asked are these:

>           (1) whether the condition created by the
>           chosen method of operation constitutes a
>           hazardous situation foreseeably harmful to
>           others;
>
>           (2) whether the proprietor used reasonable
>           and ordinary care toward its invitees under
>           these circumstances; and
>
>           (3) whether the condition created was the
>           direct and proximate cause of the plaintiff's
>           injury.

**Martin**, 946 S.W.2d at 320 (quoting **Hale v. Blue Boar Cafeteria Co.**, an unreported decision of the Court of Appeals filed at Jackson on February 21, 1980); see also **Maxwell v. Red Food Stores, Inc.**, C/A No. 88-110-II, 1988 WL 95273 at *4 (Tenn.App., M.S., filed September 16, 1988, Lewis, J.). Thus, proof that a dangerous condition is a common occurrence created by a proprietor's method of operation raises a jury question as to whether the proprietor took reasonable precautions to protect its customers from injury. **Martin**, 946 S.W.2d at 318; **Barrett v. Red Food Stores, Inc.**, C/A No. 01A01-9108-CV-00302, 1992 WL 33891 at *5 (Tenn.App., M.S., filed February 26, 1992, Lewis, J.). "Of course, the customer is also required to use reasonable care for his or her own safety." **Blue Boar**, slip op. at 6.

8

In the "method of operation" cases, "the courts have backed away from the strict application of the actual or constructive notice requirement." *Wilson v. Target Stores, Inc.*, C/A No. 03A01-9209-CV-00322, 1993 WL 30617, *3 (Tenn.App., W.S. at Knoxville, filed February 10, 1993, Crawford, J.). The three-question analysis in *Martin*, *Blue Boar*, and *Maxwell* "completely omits any requirement of notice under the theory that a defendant who has created a dangerous condition needs no notice of what he has done." *Martin*, 946 S.W.2d at 320. However, "this Court has begun to articulate the [m]ethod of [o]peration theory in terms of constructive notice." *Id.; see Worsham v. Pilot Oil Corp.*, 728 S.W.2d 19, 20 (Tenn.App. 1987)("the requirements of constructive notice may be met where a dangerous condition inside a self-service business is not an isolated one but is reasonably foreseeable to the owner because the condition is established by a pattern of conduct, a recurring incident, or a general or continuing condition....") Recently, the courts "have focused almost entirely on determining whether there is a pattern of conduct, a recurring incident or a general or continuing condition indicating the dangerous condition's existence." *Martin*, 946 S.W.2d at 320 (citing *Beske v. Opryland USA, Inc.*, 923 S.W.2d 544, 546 (Tenn.App. 1996)).

IV.

Kroger strenuously argues that there is no evidence that it had actual or constructive notice of the cardboard-covered turkey gravy and glass such as would render it liable to the plaintiff. It also contends that the evidence in this case

9

does not present a factual scenario of the type contemplated by the method of operation theory of premises liability.

There is evidence in this record that, on the morning in question, an unidentified shopper reported to a Kroger manager at the Customer Service station in the front of the store that there was a dangerous condition on the floor in the dairy section of the store. The manager's written incident report is in the record:

> I was in Customer Service at approximately 11:40 p.m. [sic][2] assisting customers. A customer notified me that she almost fell in the dairy aisle. She stated that there was a spill or something in the floor that almost caused her to fall, and that we better get it up before someone else falls. I thanked her for reporting the situation, and she left. I immediately told Connie Harrell, who was floor supervising, about the spill. At this time she sent a courtesy clerk to clean up the spill. When the courtesy clerk arrived to clean up the spill Mrs. Friar had already fallen.

David Riker, the courtesy clerk who was dispatched to the scene, testified that when he arrived in the dairy section, the plaintiff had already fallen.

While there is clearly evidence in this record of actual notice of a dangerous condition on the floor in the dairy section, that does not conclude our inquiry. We must next determine whether the defendant had actual notice *prior* to the accident and sufficiently in advance of the accident to take

---

[2]The parties agree that the manager meant to identify the time as 11:40 *a.m.*

10

reasonable steps to correct the danger or warn of its existence. In this case, there is no evidence, direct or circumstantial, that the Kroger manager was advised of the spill *before* the plaintiff fell. It is obvious from the record that the plaintiff had not fallen when the "reporting" patron herself almost fell. By the same token, it is likewise clear that she had not fallen when the patron started toward the front of the store to report the spill. However, we do not know from this record whether the plaintiff fell before or after this patron reached the front of the store and made her report to a store manager.

The plaintiff argues that instead of paging a courtesy clerk to the front of the store and then dispatching him to the site of the spill, the manager or his designee should have given a warning over the intercom that there was a dangerous condition on the floor in the dairy aisle; but this argument runs afoul of the same sequence-of-events problem addressed in the preceding paragraph. We simply have no proof that the defendant had sufficient advance notice to prevent this accident. Since we do not know when the plaintiff fell in relation to the point in time that the Kroger manager received the report of the spill, we cannot say that, had Kroger acted as expeditiously as humanly possible, the accident could have been prevented. The person who reported the spill had to walk a considerable distance from the site of the spill to the Consumer Service area in order to report the spill. It is no more logical to assume that the plaintiff fell after the report to the Kroger manager than it is to assume that she fell before the patron reached the Customer Service area. *See* **Martin v. Washmaster Auto Center, USA**, 946 S.W.2d 314,

11

317 (Tenn.App. 1996) ("...the jury is not permitted to engage in conjecture, speculation, or guesswork as to which of two equally probable inferences is applicable.") Therefore, liability in this case cannot be predicated on actual notice.

The issue of constructive notice is a different matter. We believe that there is material evidence in this case to support a jury verdict in favor of the plaintiff on the theory of constructive notice.

Exhibit number 1 in this record is a blown-up diagram of the inside of the store. It reflects that it was prepared by the Facility Engineering Department of Kroger. It is labeled a "Fixture Plan"; is drawn to scale (1/8 inch equals 1 foot); and shows the location of, and drawings of, the various food counters, shelves, coolers, checkout counters and other fixtures in the store. As far as the various fixtures are concerned, the diagram was presented to the jury as an accurate layout of the store at the time of the plaintiff's fall. This exhibit constitutes material evidence illuminating the testimony and/or movements of the plaintiff; the "eyeball witness" -- an individual by the name of Barbara Beatty; store personnel; and the unidentified shopper who originally reported the spill to Kroger's manager.

Ms. Beatty testified that she was shopping in Kroger's Oak Ridge store on the morning in question. After shopping in the grocery aisles to the right of her point of entrance, she made her way to the meat department located in the back of the

12

store.  Exhibit 1 reflects that when she was positioned at the meat counter, she was then approximately 100 feet from, and to the right of, the general area in which the plaintiff fell.  Ms. Beatty testified that when she reached the meat counter, she ordered a steak.  She waited while the butcher weighed the steak, wrapped it, and then put a sticker on it.  While she was in the meat area -- a period of time that is not expressly quantified in the record -- she did not hear the sound of glass breaking.  Exhibit 1 reflects a relatively clear path for hearing from the meat department to the place in the dairy section where the plaintiff later slipped and fell.

From the meat department, Ms. Beatty proceeded to her left and down the back side of the store to the dairy section.  While in the dairy section, she saw the spill on the floor.  It was located near the inside of one of the free-standing dairy coolers which, as previously indicated, were located out from the wall dairy case.  Exhibit 1 reflects that the free-standing coolers are located eleven feet from the wall case.  This eleven feet of space is designed to be an aisle in the dairy section of the store.  It was while Ms. Beatty was in this aisle that she first noticed the spill.

Ms. Beatty testified that she had been aware of the spill for about five minutes when she saw an unidentified person place a piece of cardboard over the spill.  She was unable to say whether that individual was a Kroger employee or a store patron.  In any event, Ms. Beatty's testimony -- when construed most favorably to the plaintiff -- is that it was an additional two to

13

five minutes later when she saw the plaintiff slip and fall on the area of glass and turkey gravy covered by the cardboard. It is significant to recognize that this combined period of seven to ten minutes came *after* a period of time during which Ms. Beatty was in the immediate area *without hearing the breaking of glass.*

The plaintiff testified that she was shopping in the aforesaid eleven-foot aisle of the dairy section when she turned around and slipped and fell on the mess described in the preceding paragraph. She did not see this spill before she fell.

There was evidence that the Kroger store was crowded that day with pre-Thanksgiving Day shoppers. There was also evidence that the store had increased its normal staff to handle the busy Thanksgiving-week traffic. Even at that, the grocery manager testified that while he normally walked through the store 15 to 20 times a day, that morning he had only had time to walk through the dairy section, which was specifically included within his area of responsibility, three or four times. A jury could conclude from all of this evidence that Kroger was under-staffed at the time of the plaintiff's fall during the busy Thanksgiving shopping period.

There is a dispute in the record as to whether a particular Kroger employee -- whose responsibility it was to sweep the floor -- was present in the dairy area shortly before the plaintiff's fall. Suffice it to say that the jury had evidence before it which, if believed, would tend to show that the employee in question was *not* in the area at or around the

14

time of the plaintiff's fall.  This is significant because that employee signed a statement that he "was sweeping the store from 10:00 - 11:00 a.m. and found no sign of any spill on the dairy aisle," and because another employee testified that the individual who signed the statement told him that he had been in the area of the fall five minutes before the plaintiff slipped.

A Kroger employee working in the dairy section testified that he clocked out for lunch at 11:06 a.m., and clocked back in at 11:35 a.m.  His time record supports these times.  He testified that he did not see the spill when he left the dairy section to go to lunch, and that when he returned to the section after clocking in at 11:35 a.m., the plaintiff was already on the floor being attended to.[3]  However, it should be noted that the record clearly reflects that the site of the spill was close to a mobile bin that was then being used by the store as a receptacle for discarded cartons.  The dairy section employee testified that there had been nothing to prevent him from returning the mobile bin to storage before he went to lunch, but that he simply had elected not to do so.  From certain angles, the mobile bin tended to block the spill from view.

In the instant case, there were a number of "factor[s] to be considered" on the subject of constructive notice.  *See* ***Paradiso***, 499 S.W.2d at 79.  We find material evidence to support the conclusion that the "circumstances of time and place are such that by the exercise of reasonable care the proprietor should

---

[3]Kroger's incident report reflects that Mrs. Friar fell at 10:40 a.m.; however, it is clear from the testimony that this is an approximation.

have become aware of [the dangerous] condition." **Simmons**, 713 S.W.2d at 641. This is not a case where the plaintiff is unable to show what it was that he or she slipped on. *Cf.* **Martin**, 946 S.W.2d at 318; **Maxwell**, 1988 WL 95273 at *3. By the same token, this is not a case where the plaintiff is unable to show how long the dangerous condition existed. *Cf.* **Hardesty**, 953 S.W.2d at 683; **Ogle**, 919 S.W.2d at 47; **Jones**, 600 S.W.2d at 732. In this case, we know what the plaintiff stepped in, and we know it had been there for some period of time.

Disregarding all evidence against the verdict and construing the evidence in the strongest light to sustain the verdict, we are left with evidence that the spill was on the floor for a little less than ten minutes, *plus* the period of time that Ms. Beatty was in the general area and did not hear the breaking of glass. A reasonable inference from her failure to hear the jar break is that the jar of turkey gravy had been dropped *before* Ms. Beatty entered the general area of the meat and dairy sections. While we do not know how long Ms. Beatty was in the area before she saw the spill, we do know that the jury had before it the diagram, photographs of the interior of the store, testimony that the store was crowded, and testimony as to what Ms. Beatty was doing during the time that she did not hear breakage. The jurors also had their own shopping experiences in large supermarkets. They did not shed those experiences when they entered the courthouse. They could evaluate all of the relevant evidence, including the testimony of the plaintiff and Ms. Beatty, in light of their own shopping experiences in such stores.

16

In summary, the record, when examined so as "to take the strongest legitimate view of all of the evidence in favor of the verdict," *see* **Electric Power Board of Chattanooga**, 691 S.W.2d at 526, reflects direct, circumstantial, and inferential, evidence tending to show: that a dangerous condition existed on the floor at the time of the plaintiff's fall; that the dangerous condition had existed on the floor for upwards of ten minutes *plus* an additional period of time, as reasonably measured by the jury, representing the time that Ms. Beatty was in the general area of the dairy section and did not hear glass breaking; that the attention of shoppers, such as the plaintiff, would be focused primarily --as intended by Kroger -- not on the floor, but on the shelves and other display devices on and in which the store's products were presented for sale; that the dangerous condition had been partially blocked from the view of shoppers by a mobile bin that could and should have been off the floor; that Kroger knew that more customers usually meant more spills and breakage; that the Kroger manager responsible for the dairy section had failed to patrol the store as often as he had previously determined was necessary because Kroger failed to have sufficient people on duty to service the increased number of shoppers during Thanksgiving week -- a crowd that Kroger had anticipated; and that Kroger had been less than candid as to whether an employee with sweeping and mopping responsibilities had been in the area of the dangerous condition around the time of its creation.

When all of the above is considered, we believe that there was "material evidence from which the trier of fact could

conclude the condition existed for sufficient time and under such circumstances that one exercising reasonable care and diligence would have discovered the danger." **Paradiso**, 499 S.W.2d at 79. In this case, the issue of reasonableness was for the jury. This is certainly not a case where the facts and inferences are such as to require a court to find that reasonable minds could only conclude that Kroger had acted in a reasonable manner in light of all of the circumstances.

The appellant's issue with respect to a lack of material evidence to support the verdict is found to be without merit.

V.

Kroger contends that counsel for the plaintiff made improper statements during *voir dire* that warrant reversal of the trial court's judgment. Kroger relies upon cases condemning the practice of counsel referring to awards in other cases during closing argument for the purpose of "influenc[ing] the jury in fixing the amount of damages, or where the tendency of the same may be to influence the jury in fixing the damages." *See* **Mayor, Etc., of City of Jackson v. Pool**, 91 Tenn. 448, 19 S.W. 324, 326 (1892). *See also* **Pullman Co. v. Pennock**, 118 Tenn. (10 Cates) 565, 569 (1907); **Tubb v. Boyd**, 13 Tenn.App. 432 (1931).

In the instant case, counsel for the plaintiff, during the course of his *voir dire*, inquired of a number of prospective jurors as to whether they felt that a jury could be trusted to

18

properly assess compensatory damages. He asked the jurors if they were aware of the widely-reported case wherein McDonald's was ordered by a jury to pay substantial damages to a plaintiff who had been burned when overheated coffee fell in her lap. As a part of this inquiry, counsel asked the prospective jurors, over Kroger's objection, if they were aware of certain facts in that case -- facts which, according to counsel, were not widely reported -- that tended to support the jury's verdict.

We agree with Kroger that counsel should not have been allowed to tell prospective jurors about what he understood were the facts of the McDonald's case. This was improper because it injected facts into the *voir dire* that were not widely reported and may or may not have been true; but counsel's practice must be viewed in the context of his obvious motivation: he wanted to impress upon the jury his view that the widely-reported McDonald's case had been misreported by some in an attempt to "poison" potential jury pools throughout the country. He used the "facts" that he had learned about that case in his questioning in an attempt to persuade the jurors that they should not conclude from this misreporting that the jury system was "out of control." He repeatedly asked prospective jurors if they felt that a jury could fairly assess damages in a case such as the instant litigation. He brought up the following "facts" about the McDonald's case: that the plaintiff in that case had suffered third degree burns and had incurred over $200,000 in medical bills; that the company had reported that over 3,000 people per year were burned as a result of overheated coffee; that McDonald's had overheated its coffee to increase coffee

19

sales; that McDonald's earns $2.1 million in profits from coffee sales each day; and that the trial judge in that case had reduced the jury's award.

While we believe that counsel's suggestion of these alleged facts was improper, we find no abuse of discretion on the part of the trial judge in permitting counsel to discuss aspects of the case *that were widely reported,* in an attempt to determine whether the impartiality of any of the prospective jurors had been "infected" by the reporting of this celebrated case. Potential jurors do not live in a vacuum. Their attitudes are affected by that to which they are exposed. It is important to ensure that a jury's impartiality has not been adversely affected by the media blitzes -- from the defendant's side as well as from the plaintiff's side -- that are all too common in the world in which we live. Having said all of this, we hasten to add that this type of inquiry must be conducted under the close supervision of the trial judge, acting within his sound discretion.

The cases cited by Kroger are not applicable for several reasons. First, those cases pertain to closing argument and not *voir dire;* and, second, the remarks in the instant case were clearly not designed to influence the jury to compare this case to the McDonald's case so that it would return a large award for the plaintiff. It is clear beyond any doubt that the questions were designed to ferret out individuals who would be less inclined to award adequate damages because of their belief that juries were "out of control" in awarding unwarranted damages. In any event, there is no indication that counsel's

20

remarks and questions resulted in an excessive award -- as somewhat evidenced by the fact that Kroger does not contend on this appeal that the award is excessive. In fact, the award is reasonable given the plaintiff's injuries, course of treatment, and prognosis. Furthermore, it is worth noting that the facts of the McDonald's case are completely different from those of the instant case. We find no basis for arguing that counsel referred to the McDonald's case in an attempt to induce the jury to compare the two cases and thereby render an excessive award.

A party, through counsel, has the right to inquire into a potential juror's "biases." *See* **Painter v. Toyo Kogyo of Japan**, 682 S.W.2d 944, 947 (Tenn.App. 1984). In the **Painter** case, this court addressed *voir dire*:

> Our courts have explained that "[t]he purpose of *voir dire* examination of prospective jurors is to enable counsel to become acquainted with their qualifications, interests, or biases, as a matter of fact,...and to enable counsel to exercise peremptory challenges." **Wallis v. State**, 546 S.W.2d 244, 249 (Tenn.Cr.App. 1976). [citations omitted]. *See generally* 47 Am.Jur.2d *Jury* § 195 (1969), where it is stated that:
>
> > "[f]ull knowledge of all relevant and material matters that might bear on possible disqualifications of a juror is essential to a fair and intelligent exercise of the right of counsel to challenge either for cause or peremptorily. Accordingly, litigants are granted the right to examine prospective jurors on their voir dire in order to enable them to select a jury composed of men and women qualified and competent to judge and determine the facts in issue without bias, prejudice, or partiality."

21

With the purpose stated above in mind, it is reasonable that:

> "[a] wide latitude is allowed counsel in examining jurors on their voir dire. The scope of inquiry is best governed by a wise and liberal discretion of the court, but the adverse litigants should be given the right to inquire freely about the interest, direct or indirect, of the proposed juror, that may affect his final decision. Thus, reasonable latitude should be given parties in the examination of jurors to gain knowledge as to their mental attitudes toward the issues to be tried, for the purpose of aiding them in striking jurors if they are not successful in challenging them for cause."
> 47 Am.Jur.2d, *supra*, § 201.

The rule that trial judges possess wide discretion in overseeing jury *voir dire* is well supported in this jurisdiction. Specifically, our Court of Criminal Appeals has stated that "[t]he trial judge has wide discretion in controlling examination of prospective jurors and his action will not be disturbed on appeal unless there was an abuse of that discretion." [Citations omitted].

*Id*. at 947–48.

We find no abuse of discretion in the trial court's decision to allow counsel to question the prospective jurors regarding the widely-reported McDonald's case. To the extent that the court permitted counsel to tell the jurors about counsel's version of certain facts of that case that were not widely reported, we cannot say that this constituted error that more likely than not affected the judgment. *See* Rule 36(b), T.R.A.P.

VI.

22

                                    A.


     Kroger contends that the trial court erred in charging
the jury regarding the method of operation theory of liability
and in permitting counsel for the plaintiff to argue this theory
to the jury.


     The plaintiff argued at trial, and argues here, that
spills and breakage were not unusual occurrences at Kroger's Oak
Ridge store.  She calls our attention to the testimony of store
employees to the effect that spills and breakage were a common,
every-day occurrence.  The plaintiff points out that Kroger's
Housekeeping Record reflects that cleanups unrelated to general
cleaning activities occurred 18 times during Thanksgiving week.
She also points out that there were 51 such cleanups in the month
of November, 1994.  She calls our attention to testimony
indicating that there were spills and breakage that were not
recorded on the Housekeeping Record.  She contends that this
evidence brings this case within the method of operation theory
of liability.


     In this case, the trial court gave a complete and
accurate charge regarding the liability of a proprietor for
maintaining a dangerous or defective condition on its premises.
The charge includes the method of operation theory of liability,
as set forth earlier in this opinion.


     We agree with Kroger that the facts of this case do not
even arguably fall within the method of operation theory.  We
know of no case extending this theory to a factual pattern

                                   23

similar to the one presented in this case.  We agree with the following statement from the decision of the federal district court in the case of **Stinson v. Wal-Mart Stores, Inc.**, No. 1:95-CV-232, slip op. at 5 (E.D. Tenn. June 7, 1996), *aff'd,* 124 F.3d 199 (6th Cir. 1997)(no published opinion):

> [w]hile discarded debris generally may be a common or everyday occurrence within the defendant's store, the common occurrence theory has only been applied in cases where particular debris has been discarded in a particular area, so that the defendant owner or operator knew or should have known of the dangerous condition created thereby.

The dangerous condition in this case was not "created" by Kroger's method of operation as that concept is addressed in the various cases relied upon by the plaintiff.

The facts of this case simply do not fit within the ambit of the method of operation theory of liability; however, this does not mean that either the plaintiff's argument or the trial court's charge with respect to this theory amounts to reversible error in this case.

The jury returned a general verdict.  T.C.A. § 20-9-502 provides as follows:

> If any counts in a declaration are good, a verdict for entire damages shall be applied to such good counts.

In **Tutton v. Patterson**, 714 S.W.2d 268 (Tenn. 1986), the Supreme Court reviewed a jury's general verdict for the plaintiff in a

situation where there was no evidence to support one theory of recovery, but evidence to support other theories:

> Tennessee courts have held on the basis of the above quoted statute that a trial court's erroneous instruction on one count of a multicount suit is harmless error if its instructions as to the other counts were proper. [citations omitted]. "[A] general verdict approved by the trial judge is not vitiated by the absence of proof on one or more counts of the declaration if there is evidence to sustain the averments of a single count." [citations omitted].
>
> In ***Bloodworth v. Stuart***, *supra*, plaintiff relied upon two separate theories; the attractive nuisance doctrine, and the playground doctrine. The trial judge in his charge submitted both theories to the jury. The jury returned a general verdict for plaintiff. On appeal, this Court found that the trial judge erred in not directing a verdict for the defendant on the attractive nuisance count. There was material evidence in the record from which the jury could conclude that the playground doctrine applied; thus applying T.C.A. § 20-9-502, this Court held that "[h]aving found the jury was justified in finding liability under the count of the declaration based on the playground doctrine, the verdict will be applied to that count." 221 Tenn. at 577, 428 S.W.2d 786. Justice Dyer, in his dissent, argued that an erroneous instruction in regard to a multiple count case can be reversible error even though proper instructions were given as to other counts being litigated. He concluded that the defendant was prejudiced by submission to the jury the attractive nuisance count.
>
> In this case Defendant contends that the trial judge erred in submitting the vicarious liability count to the jury. We are of the opinion that the trial court's erroneous instruction in regard to this count is harmless error, having found that the jury was justified in finding the Defendant liable under either of the other two counts. ***Bloodworth v. Stuart***, *supra*. We cannot say that after "considering the whole record," the erroneous charge "more probably than not affected the judgment." Rule 36(b), T.R.A.P.

25

*Tutton*, 714 S.W.2d at 271.  As we have previously discussed in some detail, there was material evidence in the instant case to support a finding of liability under a constructive notice theory of recovery; hence, there was a theory of liability to which the jury's general verdict could be applied.

We find, as did the *Tutton* court, that, considering the record as a whole, the trial court's error in charging the method of operation theory was not of such a magnitude to have "more probably than not affected the judgment."  Rule 36(b), T.R.A.P.  *See also* **Bloodworth v. Stuart**, 528 S.W.2d 786 (Tenn. 1968).

This issue is found adverse to Kroger.

B.

Kroger argues that the trial court erred in explaining to the jury that the court would reduce the amount of damages found by the jury by the percentage of fault assessed to the plaintiff.[4]  Kroger points to the following language in **McIntyre v. Balentine**, 833 S.W.2d 52 (Tenn. 1992):

> In all trials where the issue of comparative
> fault is before a jury, the trial court shall
> instruct the jury on the effect of the jury's
> finding as to the percentage of negligence as
> between the plaintiff or plaintiffs and the
> defendant or defendants.  [Citation omitted].
> The attorneys for each party shall be allowed
> to argue how this instruction affects a
> plaintiff's ability to recover.

---

[4]The jury found damages of $300,000.  It assessed Kroger's fault at 70%.

26

*Id.* at 57.  Kroger contends that this language "only requires the Court to explain that the plaintiff cannot recover unless he or she is less than fifty percent at fault."  According to Kroger, any further explanation creates the risk that the jury will, in effect, pre-determine the plaintiff's ultimate recovery by inflating its award of damages, thereby offsetting the effect of any reduction for the plaintiff's own percentage of fault.

We find that the trial court's instruction was in strict accordance with the principles of *McIntyre*.  We reach this conclusion based upon the "suggested jury instructions" set forth by the Supreme Court in the appendix to the *McIntyre* opinion.  Those instructions provide, in pertinent part, as follows:

> ... If, on the other hand, you determine from the evidence that the percentage of negligence attributable to plaintiff was less than the percentage of negligence attributable to defendant, then *plaintiff will be entitled to recover that portion of his/her damages not caused by plaintiff's own negligence*.
>
> The court will provide you with a special verdict form that will assist you in your duties.  This is the form on which you will record, if appropriate, the percentage of negligence assigned to each party and plaintiff's total damages.  *The court will then take your findings and either* (1) enter judgment for defendant if you have found that defendant was not negligent or that plaintiff's own negligence accounted for 50 percent or more of the total negligence proximately causing his/her injuries or (2) *enter judgment against defendant in accordance with defendant's percentage of negligence.*

*Id.* at 59 (emphasis added).

27

In the instant case, the subject instruction accurately states the law and is consistent with the instructions suggested in *McIntyre*.  We therefore find this issue to be without merit. To the extent that Kroger asks us to change the holding of *McIntyre*, we are obviously without authority to do so.  *See Bloodworth*, 428 S.W.2d at 789.

VII.

The judgment of the trial court is affirmed.  Costs on appeal are taxed to the appellant and its surety.  This case is remanded to the trial court for enforcement of the judgment and collection of costs assessed below, all pursuant to applicable law.

 

_____
Charles D. Susano, Jr., J.


CONCUR:


_____
Houston M. Goddard, P.J.


_____
William H. Inman, Sr.J.