IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 2, 2000 Session

S.E.A., INC. v. SOUTHSIDE LEASING COMPANY, ET AL.

Appeal from the Chancery Court for Knox County
No. 137852-1    John F. Weaver, Chancellor

FILED September 29, 2000

No. E2000-00631-COA-R3-CV

S.E.A., Inc. brought suit in Knox County Chancery Court seeking an injunction and alternatively, damages, against its lessor, Southside Leasing Company, and Southside's secured creditor, Moss W. Yater, regarding a non-disturbance agreement. Yater is also Southside's majority shareholder, president and director. S.E.A.sought to sublease a portion of the property. Pursuant to the terms of the lease between S.E.A. and Southside, Southside consented to the sublease and executed the requested non-disturbance agreement. However, Yater, Southside's secured creditor, refused to execute the non-disturbance agreement unless Southside received a portion of the rent from the sublease. Defendants filed motions for summary judgment which were granted by the Trial Court. S.E.A. appeals the Trial Court's granting of summary judgment to the Defendants. We affirm.

Tenn. R. App. P. 3; Judgment of the Chancery Court Affirmed; case Remanded.

Swiney, D. Michael, J., delivered the opinion of the court, in which Houston M. Goddard, P. J., and Herschel P. Franks, J. joined.

Charles A. Wagner, III, and W. Turner Boone, Knoxville, Tennessee, for the appellant, S.E.A., Inc.

Fredrich H. Thomforde, Jr., Knoxville, Tennessee, for the appellee, Southside Leasing Company.

George W. Morton, Jr., Knoxville, Tennessee, for the appellee, Moss W. Yater.

OPINION

## Background

This appeal arises from the Trial Court's granting of summary judgment to the Defendants, Southside Leasing Company ("Southside") and Moss W. Yater ("Yater"). Plaintiff, S.E.A., Inc., ("S.E.A."), brought suit seeking an injunction or in the alternative, damages, against its lessor, Southside, and Southside's creditor, Yater, regarding S.E.A.'s request to sublease property located on Merchants Drive in Knoxville, Tennessee, to a third party, BankFirst. Yater has a dual role in this matter since he is Southside's creditor as well as Southside's majority shareholder, director and president.

Southside is a closely-held Tennessee corporation which recorded its corporate charter with the Secretary of State on May 28, 1947. At that time, Southside's president was Yater's father. Currently, Yater is Southside's majority shareholder, president and general manager. Southside's only other shareholder is Yater's sister, Marthanna Yater. Ms. Yater has little involvement with the management of Southside. Southside's Board of Directors is composed of Yater, his sister, and Southside's bookkeeper, Randall Webb. Yater and Webb are the only employees of Southside. Webb assists Yater in keeping corporate records and managing an apartment complex which is owned by Southside.

It appears Southside has held few, if any, shareholder meetings or board of directors' meetings in the past five years. Southside has not kept any minutes of its shareholders' meetings or directors' meetings since at least 1979. Southside does prepare annual reports to send to the Tennessee Secretary of State and files Form 1099's and W-2's with the Internal Revenue Service.

On March 22, 1982, S.E.A.'s predecessors-in-interest, Joe C. and Joyce Holdredge and William C. and Violet Martin, entered into a Ground Lease with Southside. The Ground Lease provided for a term beginning in March, 1982 and ending on December 31, 2017, with an option to extend the lease to the year 2042. The Ground Lease concerned five lots located in Knoxville, Tennessee, described as Lots 4, 5, 6, 7 and 8. Lot 4 is the property at issue in this case. The Ground Lease also sets forth a schedule of rent for Lots 5-8 which were developed at the time of the Ground Lease and a separate rent schedule for Lot 4 which allows for different rent amounts, depending upon whether S.E.A. developed Lot 4.

The Ground Lease contemplates the possible sublease of the property as follows:

> 7. <u>LESSOR'S CONSENT REQUIRED FOR ADDITIONAL SUB-LEASE OR ASSIGNMENT.</u>  This lease may not be assigned, nor may any part of the leased premises be sublet, without the written consent of Lessor. Lessor agrees that it will not unreasonably withhold its consent to sublease . . . .

The lessees, the Martins and the Holdredges, executed the Ground Lease individually while the lessor, Southside, executed the Ground Lease as follows:

LESSOR:   Southside Leasing Company
By          Moss W. Yater, President

Later in 1982, the Ground Lease was amended to substitute Merchants Plaza, Inc. as lessee. Paragraph 19 of the Ground Lease was also amended to include the following:

> Lessor agrees that as part of any refinancing of existing debt and as a condition of Lessee's obligation to subordinate its interest in the leasehold estate as hereinabove provided, that Lessor shall obtain from the holder of any mortgage or beneficiary of a deed of trust placed on the premises, a non disturbance and attornment agreement which shall also be executed by Lessor and Lessee . . . .

Thereafter, on November 27, 1984, Merchants Plaza assigned the Ground Lease to S.E.A. as part of a Chapter 11 reorganization plan for the bankruptcy of the lessee.

A Non-Disturbance Agreement was executed by S.E.A., the Defendants, Marthanna Yater, and Joe Holdredge on November 6, 1984. The 1984 Non-Disturbance Agreement was necessary for S.E.A.'s reorganization plan as it required S.E.A. to obtain financing to meet the terms of the plan. The 1984 Non-Disturbance Agreement set forth the parties' agreement as follows:

> 1.     The Yaters as the holder of the obligations secured by the Deed of Trust and the Lessor [Southside], as the fee owner of the Premises, agree with respect to the Deed of Trust, the Ground Lease and any subsequent deed or deeds of trust made to secure further borrowings by [Southside], that so long as the Lessee [S.E.A.], its successors and assigns, performs all of [S.E.A.'s] obligations under the Ground Lease as amended, [S.E.A.], its successors and assigns shall not be joined as a party defendant in any foreclosure action or proceeding which may be instituted or taken by the holder of the obligations secured by the Deed of Trust or any renewal, modification, replacement or extensions thereof or any subsequent deeds of trust which may be granted with respect to the Premises; and [S.E.A.] shall not be evicted from the Premises nor shall [S.E.A.'s] leasehold estate under the Ground Lease be terminated or disturbed, nor shall any of the [S.E.A's] rights under the Ground Lease be affected in any way by reason of any default under the Deed of Trust or any deed of trust hereafter placed against the Premises . . . .

*  *  *

-3-

4. The parties acknowledge that it is the purpose and intent of this Non-Disturbance Agreement to allow [S.E.A], its successor's (sic) and assigns to remain in quiet and peaceful possession of the Premises so long as it performs obligations of [S.E.A.] under the Ground Lease regardless of any existing or subsequent borrowings by [Southside], its successors and assigns, and regardless of any default which may now or hereafter exist on the part of [Southside] under the Deed of Trust and/or any subsequent deed or deeds of trust granted on the Premises to secure subsequent obligations of [Southside]. Nothing herein shall in any way be construed so as to limit the right of [Southside], its successor or assigns, from further encumbering the Premises.

The 1984 Non-Disturbance Agreement does not make any mention of the rights and obligations associated with S.E.A's sublease of the premises.

The 1984 Non-Disturbance Agreement was executed by the parties as follows:[1]

LESSOR:
SOUTHSIDE LEASING COMPANY
By: _____ Moss W. Yater
Its: _____ President _____

HOLDREDGE:
Joe C. Holdredge

YATERS:
Moss W. Yater
Marthanna Yater

LESSEE:
S.E.A., INC.
By: Joe C. Holdredge
Its: President

Moss W. Yater and Marthanna Yater were parties to the 1984 Non-Disturbance Agreement because the Yaters are beneficiaries of a 1978 deed of trust which encumbers the leased premises along with other tracts of real property owned by Southside. The 1978 Deed of Trust provided that the tracts of Southside's property would serve as security for the Yaters' indorsement

---

[1] The 1984 Non-Disturbance Agreement is the only relevant document in the record that was signed by Yater, individually.

-4-

of a promissory note executed by Southside and payable to First Tennessee Bank in the amount of $225,000.

The 1978 Deed of Trust was executed by Moss Yater, Vice President of Southside. On May 9, 1984, the 1978 Deed of Trust was amended to reflect the Yaters' payment of the First Tennessee Bank loan in the amount of $194,548.95 for the benefit of Southside.

Sometime prior to November 1, 1997, S.E.A. and BankFirst began negotiations regarding the sublease of Lot 4 to BankFirst for a period of ten years with an option to renew up to four additional lease terms at five years per term. The total rent payment for the initial ten year term was $330,000, to be paid in monthly installments of $2,750.00. S.E.A. presented both Defendants with a non-disturbance agreement ("BankFirst Non-Disturbance Agreement") for the BankFirst sublease.

Paragraph Two of the BankFirst Non-Disturbance Agreement sets forth a non-disturbance agreement and consent to sublease by Southside as follows:

2.      Agreements by Owner [Southside].[Southside], as lessor under the Ground Lease, hereby represents that S.E.A., Inc. is the current lessee under the Ground Lease, that the Ground Lease is in full force and effect with respect to the Premises, and that no event or condition of default exists under the terms of the Ground Lease. If [S.E.A.] under the Ground Lease defaults pursuant to its terms, [Southside] agrees to notify BankFirst, as Lessee under the Lease Agreement, and further agrees to give BankFirst 30 days to cure any such default, such 30-day period to begin when such notice is mailed certified mail to BankFirst . . . . [Southside] agrees that BankFirst may remain in quiet possession of the Premises as long as BankFirst is not in default under the terms of the Lease Agreement, and as long as S.E.A., Inc. is not in default under the terms of the Ground Lease, or as long as any defaults under the Ground Lease are cured within 30 days of any written notice of default sent to BankFirst. If there is an uncured default under the Ground Lease, BankFirst also may remain in quiet possession of the Premises as long as BankFirst pays to [Southside] the monthly rental required under the Lease Agreement, which would otherwise be paid to S.E.A., Inc. [Southside] consents to the Lease Agreement entered into by BankFirst as Lessee and S.E.A., Inc., as Lessor . . . .

Paragraph Three of the BankFirst Non-Disturbance Agreement contained the following non-disturbance clause for Yater:

3.      Agreement by Yater. Yater, as holder of that certain indebtedness in the original principal amount of $225,000.00, secured by the Yater Deed of Trust, agrees that BankFirst shall not be joined as a party defendant in any foreclosure action or proceeding which may be instituted or taken by Yater

-5-

as the holder of such obligations, or any renewal, modification, replacement or extension thereof, or any subsequent deeds of trust which may be granted with respect to the Premises; and BankFirst shall not be evicted from the Premises nor shall BankFirst's leasehold estate be terminated or disturbed, nor shall any of BankFirst's rights under the Lease Agreement be affected in any way by reason of default under the Deed of Trust or any deed of trust hereafter placed against the Premises.

It is undisputed that Yater, as president of Southside, executed the BankFirst Non-Disturbance Agreement. Yater agrees with S.E.A. that pursuant to the terms of the Ground Lease, Southside could not unreasonably withhold its consent to a sublease by S.E.A. However, Yater, acting individually as the secured creditor of Southside, refused to execute the BankFirst Non-Disturbance Agreement. Yater, as Southside's secured creditor, demanded that in exchange for his execution of the BankFirst Non-Disturbance Agreement, S.E.A. give Southside 25-30% of the rent that it received from BankFirst under the sublease. S.E.A. did not agree to this demand. Yater never executed, in his individual capacity, the BankFirst Non-Disturbance Agreement. Southside never encouraged Yater, individually, to execute the BankFirst Non-Disturbance Agreement. Thereafter, the potential sublease between S.E.A. and BankFirst failed.

S.E.A. filed suit and initially sought an injunction requiring Defendants to execute the documents needed for the BankFirst sublease and, in the alternative, sought damages associated with the loss of the benefit of the BankFirst sublease. Yater filed a Motion for Summary Judgment which the Trial Court granted. The Trial Court, in its Memorandum Opinion, held that: (1)Yater, individually, had no contractual duty to execute the BankFirst Non-Disturbance Agreement and that Yater's execution of the 1984 Non-Disturbance Agreement did not impose any obligation on Yater to execute another non-disturbance agreement; (2) Yater's refusal to execute the BankFirst Non-Disturbance Agreement as an individual did not warrant piercing Southside's corporate veil, and in turn, subjecting Yater, as majority shareholder, to personal liability. Yater did not exercise control over Southside to cause it to commit any wrong upon the Plaintiff as Southside complied with its contractual duties and obligations under the Ground Lease and executed the BankFirst Non-Disturbance Agreement.[2]

Thereafter, Southside filed a Motion for Summary Judgment which the Trial Court granted. The Trial Court, in its Memorandum Opinion granting Southside's Motion, held that there was no genuine issue of material fact, finding that:

> [the Plaintiff made] no actionable allegation . . . that the defendant Southside failed to comply with any of its contractual obligations to the plaintiff. The defendant Southside executed and delivered all

---

[2] The Trial Court, in its Memorandum Opinion, held that S.E.A.'s Complaint failed to state a claim for piercing the corporate veil to reach Yater, individually. Thereafter, S.E.A. filed a Motion for Leave to Amend its Complaint and an Amended Motion for Leave to Amend its Complaint in order to allege facts sufficient to invoke the instrumentality rule. The Trial Court granted S.E.A.'s motion.

-6-

documents that the plaintiff requested the defendant Southside to execute.

### **Discussion**

While not stated by S.E.A. exactly this way, S.E.A. raises the following issues with respect to Southside: (1) whether Southside breached the lease agreement and its duty of good faith by its failure to cause Yater to execute the non-disturbance agreement for the sublease, and by Yater's demand that a portion of the sublease rent be provided to Southside, and (2) whether the corporate veil of Southside should be pierced in reverse so as to render Southside liable for the failure of Yater to execute the non-disturbance agreement. With respect to Yater, S.E.A. raises the following issues on appeal: (1) whether Yater, as lender to Southside, had an independent or contractual duty to execute the non-disturbance agreement, (2) whether Southside's corporate form should be disregarded so that Southside's majority shareholder, Yater, is held liable for his refusal to execute the non-disturbance agreement, and (3) whether Yater, as president and agent of Southside, is liable for his actions taken on behalf of Southside.

Our Supreme Court outlined the standard of review of a motion for summary judgment in *Staples v. CBL & Assoc.*, 15 S.W.3d 83 (Tenn. 2000):

> The standards governing an appellate court's review of a motion for summary judgment are well settled. Since our inquiry involves purely a question of law, no presumption of correctness attaches to the lower court's judgment, and our task is confined to reviewing the record to determine whether the requirements of Tenn. R. Civ. P. 56 have been met. *See Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn.1997); *Cowden v. Sovran Bank/Central South*, 816 S.W.2d 741, 744 (Tenn.1991). Tennessee Rule of Civil Procedure 56.04 provides that summary judgment is appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, *see Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn.1993); and (2) the moving party is entitled to a judgment as a matter of law on the undisputed facts. *See Anderson v. Standard Register Co.*, 857 S.W.2d 555, 559 (Tenn.1993). The moving party has the burden of proving that its motion satisfies these requirements. *See Downen v. Allstate Ins. Co.*, 811 S.W.2d 523, 524 (Tenn.1991). When the party seeking summary judgment makes a properly supported motion, the burden shifts to the nonmoving party to set forth specific facts establishing the existence of disputed, material facts which must be resolved by the trier of fact. *See Byrd v. Hall*, 847 S.W.2d at 215.
>
> To properly support its motion, the moving party must either affirmatively negate an essential element of the non-moving party's claim or conclusively establish an affirmative defense. *See McCarley v. West Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn.1998); *Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn.1997). If the moving party fails to negate a claimed basis for the suit, the non-moving party's burden to produce evidence establishing the existence of a genuine issue for trial is not

-7-

triggered and the motion for summary judgment must fail. *See McCarley v. West Quality Food Serv.*, 960 S.W.2d at 588; *Robinson v. Omer*, 952 S.W.2d at 426. If the moving party successfully negates a claimed basis for the action, the non-moving party may not simply rest upon the pleadings, but must offer proof to establish the existence of the essential elements of the claim.

The standards governing the assessment of evidence in the summary judgment context are also well established. Courts must view the evidence in the light most favorable to the nonmoving party and must also draw all reasonable inferences in the nonmoving party's favor. *See Robinson v. Omer*, 952 S.W.2d at 426; *Byrd v. Hall*, 847 S.W.2d at 210-11. Courts should grant a summary judgment only when both the facts and the inferences to be drawn from the facts permit a reasonable person to reach only one conclusion. *See McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn.1995); *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn.1995).

*Staples*, 15 S.W.3d at 88-89.

A fact is "material" for summary judgment purposes, if it must be decided in order "to resolve the substantive claim or defense at which the motion is directed." *Luther v. Compton*, 5 S.W.3d 635, 639 (Tenn. 1999) (citing *Byrd v. Hall*, 847 S.W.2d at 211).

A trial court's interpretation of a contract is a matter of law that is to be reviewed *de novo* on appeal with no presumption of correctness. *See Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999) (citing *Hamblen County v. City of Morristown*, 656 S.W.2d 331, 335-36 (Tenn. 1983)); *Park Place Ctr. Enter. v. Park Place Mall Assoc.*, 836 S.W.2d 113, 116 (Tenn. Ct. App. 1992). Our Supreme Court in *Guiliano v. Cleo*, addressed the court's role when interpreting contracts as follows:

> When resolving disputes concerning contract interpretations, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language.

*Guiliano*, 995 S.W.2d at 95 (citing *Hamblen County*, 656 S.W.2d at 333-34; *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975)). In addition, "[i]n the absence of fraud or mistake, courts should construe contracts as written." *Marshall v. Jackson & Jones Oils, Inc.*, 20 S.W.3d 678, 681 (Tenn. Ct. App. 1999) (citations omitted). Also, the courts should "avoid strained constructions that create ambiguities where none exist." *Id.* at 682. Furthermore, "[t]he courts may not make a new contract for parties who have spoken for themselves, . . . and may not relieve parties of the contractual obligations simply because these obligations later prove to be burdensome or unwise." *Id.* at 682 (citing *Petty v. Sloan,* 197 Tenn. 630, 640, 277 S.W.2d 355, 359 (1955); *Atkins v. Kirkpatrick*, 823 S.W.2d 547, 553 (Tenn. Ct. App. 1991)).

In this matter, the 1982 Ground Lease constituted an agreement between Southside and S.E.A.'s predecessors-in-interest. The plain language of neither the 1982 Ground Lease nor the Amended Ground Lease creates any obligation or duty of Yater, as a secured creditor of Southside,

to execute the requested non-disturbance agreement. Yater was not a party to these contracts. *See id.*; 1 Joseph M. Perillo, Corbin on Contracts § 1.2, at 6 (rev. 1993) (stating that "[i]t is commonly said that a contract cannot exist even though there have been expressions of mutual assent, unless there is also a *legal obligation.*") (emphasis added).[3]

Furthermore, the record does not contain any proof that the parties' intentions were otherwise. The 1982 Ground Lease does state that Southside, as the lessor, may not unreasonably withhold its consent to a sublease by the lessee. The undisputed facts show that Southside, through its president, Yater, executed the BankFirst Non-Disturbance Agreement and, therefore, consented to the sublease for Lot 4. Moreover, while the Amended Ground Lease speaks of the duty of Southside, as lessor, to obtain a non-disturbance agreement, this duty arose only in the context of "any refinancing of existing debt." S.E.A.'s request for a new and separate non-disturbance agreement in this instance did not arise from the circumstances contemplated by the Amended Ground Lease.

S.E.A.'s argument that Yater, as lender, had a duty at common law to execute a non-disturbance agreement for a potential sublessee is similarly rejected. S.E.A. concedes that there is

---

[3] The Trial Court, in its Memorandum Opinion granting Yater's Motion for Summary Judgment, quoted Corbin on Contracts, § 2 (1952), as follows:

> In English legal history, the term 'obligation' has been used in a variety of senses. At times it has meant a formal document, such as a sealed bond. Again, it has meant the entire group of jural relations created by certain facts, usually expressions of agreement. The tendency has been to narrow its usage, so that it has come to be an almost exact synonym of the term 'legal duty.' This is a term that should be used solely as a correlative of the term legal *right.* If a duty (obligation) exists, it is a duty to some person has a right against the one subject to the duty. If a legal right exists, it is a right against some person who is under a duty to the one having the right. These two correlative terms express a legal relation between the two persons, this relation consisting of certain specific facts of a kind such as have in the past caused organized society to give remedies against the duty bearer in favor of the right holder. This is what is meant by *vinculum juris*, and by 'control' that the holder of the right has over the bearer of the duty. Past judicial and legislative history enables us to look at the specific facts and predict that A can get judgment against B if the latter does not perform as promised. Legal relations are merely existing facts of life viewed in the light of a past uniformity of social action, that enable us to predict similar action in the future with respect to two or more persons.

Corbin on Contracts §2 (1952); 1 Joseph M. Perillo, Corbin on Contracts § 1.2, at 6 (rev. 1993) (emphasis in original) (citations omitted). We incorporate this portion of the Trial Court's Memorandum Opinion into our opinion.

no Tennessee case law regarding this issue.[4] Accordingly, we hold that Yater, as Southside's lender, did not have a duty, either contractually or at common law, to execute the requested non-disturbance agreement for the benefit of a potential sublessee.

S.E.A. also contends that Southside breached its duty of good faith under the 1982 Ground Lease by (1) Southside's failure to cause Yater, its creditor, to execute the BankFirst Non-Disturbance Agreement; and (2) the request of Yater, acting as an individual, that 25%-30% of the rent received by S.E.A. from BankFirst be given to Southside. Our Supreme Court discussed the nature of the duty of good faith in *Wallace v. National Bank of Commerce,* 938 S.W.2d 684 (Tenn. 1997):

> In Tennessee, the common law imposes a duty of good faith in the performance of contracts. This rule has been considered in several recent decisions of the Court of Appeals. The law regarding the good faith performance of contracts was well stated by the Court of Appeals in *TSC Industries, Inc. v. Tomlin,* 743 S.W.2d 169, 173 (Tenn. App. 1987):
>
> > It is true that there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement, and a person is presumed to know the law. *See* Restatement (2d) Contracts, § 205 (1979). What this duty consists of, however, depends upon the individual contract in each case. In construing contracts, courts look to the language of the instrument and to the intention of the parties, and impose a construction which is fair and reasonable.
>
> In *Covington v. Robinson,* 723 S.W.2d 643, 645-46 (Tenn. App. 1986), which was relied upon by the Court of Appeals in *TSC Industries,* the Court of Appeals held that in determining whether the parties acted in good faith in the performance of a contract, the court must judge the performance against the intent of the parties as determined by a reasonable and fair construction of the language of the instrument. In a later decision, the Court of Appeals held that good faith in performance is measured by the terms of the contract. "They [the parties] may by agreement, however, determine the standards by which the performance of obligations are to be measured." *Bank of Crockett v. Cullipher,* 752 S.W.2d 84, 91 (Tenn. App. 1988) (alteration in original).

---

[4] The Plaintiff cites to a Connecticut state court case and a law review article as authorities in support of this argument. However, we agree with the Trial Court's determination that these authorities provide little, if any, legal basis for this argument.

\* \* \*

> [In this case,] [t]he language of the agreements clearly states the terms and reflects the intent of the parties . . . . *Performance of a contract according to its terms cannot be characterized as bad faith.* (emphasis added).

\* \* \*

> [I]t should be noted that the common law duty of good faith in the performance of a contract does not apply to the formation of a contract. *See* Restatement (Second) of Contracts, § 205 cmt. c (1979). *Consequently, the common law duty of good faith does not extend beyond the agreed upon terms of the contract and the reasonable contractual expectations of the parties. See Sheets v. Knight*, 308 Or. 220, 779 P.2d 1000 (1989) (emphasis added).

*Wallace v. National Bank of Commerce,* 938 S.W.2d at 686-687.

In this matter, none of the documents executed by S.E.A. and Southside, including the 1982 Ground Lease, the Amended Ground Lease, and the 1984 Non-Disturbance Agreement, contain terms that require Southside somehow to cause its creditor to execute the BankFirst Non-Disturbance Agreement. Southside performed its contractual duties and obligations by executing the BankFirst Non-Disturbance Agreement. Accordingly, Southside's conduct cannot be characterized as bad faith.

S.E.A. also contends that Southside's corporate form should be disregarded and that Southside and Yater should be treated as one and the same. S.E.A. argues that the corporate veil of Southside should be pierced so as to render Yater, the individual, liable for the refusal of Southside's president and majority shareholder, who also happens to be Yater, to execute the BankFirst Non-Disturbance Agreement. On the other hand, S.E.A. also argues that the corporate veil of Southside should be pierced, in reverse, to find Southside liable for the actions of Yater, its majority shareholder. S.E.A. argues that Yater's refusal, as the individual creditor of Southside, to execute the BankFirst Non-Disturbance Agreement should be attributed to Southside. This, according to S.E.A.'s argument, would constitute a breach of the 1982 Ground Lease term since Southside, in essence, had withheld its "effective consent" to the sublease through the conduct of Yater.

Courts pierce the corporate veil, or disregard the corporate entity, to find the "true owners of the entity ... liable when the corporation is liable for a debt but is without funds due to some misconduct on the part of the officers and directors." *Muroll Gesellschaft M.B.H. v. Tennessee Tape, Inc.*, 908 S.W.2d 211, 213 (Tenn. Ct. App. 1995) (citing *Anderson v. Durbin*, 740 S.W.2d 417 (Tenn. Ct. App. 1987)); *see Manufacturers Consolidation Serv., Inc. v. Rodell*, Nos. W1998-00889-COA-R3-CV, W1998-00882-COA-R9-CV, 2000 WL 286727, at \* 16 n. 12 (Tenn. Ct. App. Mar. 10, 2000) (appl. perm. appeal filed June 11, 2000) (stating that "[t]raditionally, courts have used this

-11-

theory to impose liability against a controlling shareholder who has used the corporate entity to avoid his legal obligations.")  "A corporation and its stockholders are distinct legal entities even if all the stock in the corporation is owned by one stockholder." *Hadden v. City of Gatlinburg*, 746 S.W.2d 687, 689 (Tenn. 1988) (citing *Parker v. Bethel Hotel Co.*, 96 Tenn. 252, 34 S.W. 209, 215 (1896)).  When faced with the issue of piercing the corporate veil, courts should proceed with caution.  *Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991) (quoting 18 Am.Jur.2d Corporations, § 43, at 842, n. 79, 80, 81) (stating that "the principle of piercing the fiction of the corporate veil is to be applied with great caution and not precipitately, since there is a presumption of corporate regularity").  This Court in *Schlater v. Haynie*, discussed the issue of piercing the corporate veil as follows:

> The separate identity of a corporation may be disregarded upon a showing that it is a sham or a dummy or where necessary to accomplish justice. *Oak Ridge Auto Repair Serv. v. City Finance Co.*, 57 Tenn. App. 707, 425 S.W.2d 620.
>
> In an appropriate case and in furtherance of the ends of justice, a corporation and the individual or individuals owning all its stock and assets will be treated as identical. *E.O. Bailey & Co. v. Union Planters Title Guaranty Co.*, 33 Tenn. App. 439, 232 S.W.2d 309.
>
> * * *
>
> Each case involving disregard of the corporate entity must rest upon its special facts.  Generally, no one factor is conclusive in determining whether or not to disregard a corporate entity; usually a combination of factors is present in a particular case and is relied upon to resolve the issue. 18 Am.Jur.2d Corporations, § 48, [at] 847, [n.] 41 and 42.
>
> Even though corporate formalities have been observed, one may still challenge the corporate entity by showing that he has been the victim of some basically unfair device by which the corporate form of business organization has been used to achieve an inequitable result . . . .  18 Am.Jur.2d Corporations, § 48, [at] 851, [n.] 60, 61.
>
> While generally, a corporation will be looked on as a legal entity . . . , the corporate fiction will be disregarded and the corporate veil pierced in appropriate, special, unusual or compelling circumstances, as where sufficient reason to the contrary appears, where the corporation is created or used for an improper purpose, or where the corporate form has been abused, as when used to an end subversive of the corporation's policy.  In such cases, courts will disregard the corporate entity and deal with substance rather than form, as though

-12-

the corporation did not exist . . . . 18 C.J.S. Corporations § 9, [at] 274, 275.

There is a presumption that a corporation is a distinct entity, separate from its shareholders, officers, directors or affiliated corporations, and the party wishing to negate the existence of such separate entity has the burden of proving facts sufficient to justify piercing the corporate veil. 18 C.J.S. Corporations § 18, [at] 290.

*Schlater v. Haynie*, 833 S.W.2d at 925.

Although the issue of whether to pierce a corporate veil is not generally suitable for summary judgment, we find that the Trial Court in this matter correctly granted summary judgment to the Defendants. *See Mike v. Po Group, Inc.*, 937 S.W.2d 790, 795 (Tenn. 1996); *Electric Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn. 1985). From the undisputed material facts, Southside is not a sham or a dummy corporation. *See Schlater v. Haynie,* 833 S.W. 2d at 925 (citing *Oak Ridge Auto Repair Serv. v. City Finance Co.*, 425 S.W.2d 620, 622 (Tenn. Ct. App. 1967)). Southside's corporate form has been in existence since 1947. Although Southside is a closely-held corporation, it is still a legal entity with a separate identity from its majority shareholder as it has officers, a board of directors, and conducts business activities. *See id.* at 925-926 (stating that "the owners of a corporation have a right to control it so long as they do not use the control to defraud creditors of the corporation.") Furthermore, and most importantly, from the undisputed material facts, Southside did not use its corporate form for an improper purpose or abuse its corporate form. *See id.* at 925. (citing 18 C.J.S. Corporations § 9, at 274, 275). Southside did not withhold consent to S.E.A.'s sublease of Lot 4 and in fact, executed the BankFirst Non-Disturbance Agreement via its president, Yater. Accordingly, we agree with the Trial Court's determination that the undisputed material facts of this matter require that Southside's corporate veil not be pierced.

S.E.A.'s argument that the corporate veil should be pierced in reverse so as to render Southside liable for Yater's refusal to execute the BankFirst Non-Disturbance Agreement also fails for the reasons already discussed as to why Southside's corporate veil should not be pierced. Further, a review of Tennessee court decisions indicates that no Tennessee court has addressed this issue in the context of a shareholder/corporation relationship. Although our Supreme Court in *Continental Bankers Life Ins. Co. of the South v. The Bank of Alamo*, 578 S.W.2d 625 (Tenn. 1979), implicitly recognized that the corporate veil could be pierced in reverse, we find that case to be inapplicable to the circumstances before us. The court in *Continental Bankers* examined this issue in the context of a parent/subsidiary corporation relationship. Here, S.E.A. is seeking to pierce the corporate veil in reverse so as to make the corporation liable for the conduct of its majority shareholder. This Court in *Schlater v. Haynie* distinguished the *Continental Bankers* case which involved parent/subsidiary corporations from cases involving shareholder/corporation relationships. *Schlater v. Haynie*, 833 S.W.2d at 925 (appl. perm. appeal denied May 11, 1992) (stating that "*Continental Bankers . . .* involved a parent corporation and its subsidiary and is not applicable to the present case for that reason"). The only other Tennessee decision which involves this issue is

*Manufacturers Consolidation Serv., Inc., v. Rodell*, 2000 WL 286727, at * 16 n.12, in which this Court briefly discussed this issue and its treatment by other jurisdictions but stopped short of applying this rule.[5]   Accordingly, we hold the Trial Court did not err in declining to pierce the corporate veil in reverse.

## **CONCLUSION**

The judgment of the Trial Court is affirmed, and this matter remanded for further proceedings as may be required, if any, consistent with this Opinion, and for collection of the costs below. Costs of this appeal are taxed to the Appellant, S.E.A., Inc., and its surety.

_____
D. MICHAEL SWINEY, JUDGE

---

[5]   Unlike the *Continental Bankers* case, the court in *Manufacturers Consolidation* dealt with a shareholder/corporation relationship.  The defendants in *Manufacturers Consolidation* argued that the court should affirm the dismissal of the corporate plaintiff's claims due to the conduct of its 50% shareholder who entered the suit as a party via a motion to intervene. *Manufacturers Consolidation*, 2000 WL 286727, at * 16.  The trial court placed conditions upon the shareholder's intervention in the suit. *Id.,* at * 14, 16.  When the shareholder failed to meet these conditions, the trial court dismissed the shareholder's intervening complaint and the corporate plaintiff's underlying complaint, under Tenn. R. Civ. P. 41.02. *Id.,* at * 14.  This Court found an abuse of discretion in the trial court's dismissal of the corporate plaintiff's underlying complaint. *Id.*, at * 15-16.  The *Manufacturers Consolidation* court stated that:

> We conclude that the application of [the theory of piercing the corporate veil] should not have led to the dismissal of the [corporate plaintiff's] claims. In so holding, we express no opinion on whether a trial court, pursuant to Rule 41.02, could dismiss both a corporation's claims and the claims of its controlling shareholder based upon the theory of piercing the corporate veil.

*Id.*, at * 17. This Court further reasoned that the record did not show that the trial court, prior to the dismissal, indicated that it expected the corporate plaintiff to satisfy the conditions in the event the plaintiff/shareholder failed to do so. *Id.*